IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KAMI SMITH,

                   Plaintiff,

     v.

PRESIDIO NETWORKED SOLUTIONS,
INC.,

                   Defendant.

CIVIL ACTION
NO. 22-736

## OPINION

**Slomsky, J.**                                                           **June 26, 2024**

## TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................................. 1

II.    **BACKGROUND** ................................................................................................. 2

  A.  Hitachi Deal ................................................................................................. 2

  B.  "Peel and Grow" Restructuring ................................................................ 6

  C.  Plaintiff's Performance ............................................................................. 7

  D.  Plaintiff's Mental Health and Leave of Absence .................................... 8

III.   **STANDARD OF REVIEW** ............................................................................... 11

IV.  **ANALYSIS** ..................................................................................................... 13

  A.  **Timeliness and Exhaustion of Plaintiff's Claims Under the PHRA
      and Title VII** ............................................................................................. 13

1.   Plaintiff's Claims Under the PHRA are Untimely ........................................ 14

2.   Plaintiff's Gender Discrimination Claim Under Title VII is Timely Under the "Continuing Violations Doctrine" .................................................................... 15

3.   Administrative Exhaustion of Plaintiff's Title VII Claims ............................ 18

**B.   Plaintiff's Title VII Claims** ...................................................................................... 21

1.   Gender Discrimination ................................................................................... 22

   i.   Prima Facie Case .................................................................................... 22

   ii.   Nondiscriminatory Reason for Termination ............................................. 23

   iii.   Pretext for Discrimination ....................................................................... 24

2.   Retaliation ...................................................................................................... 25

3.   Disparate Pay ................................................................................................. 29

**C.   Claims Under the ADA** ............................................................................................. 31

1.   A Genuine Dispute of Material Fact Exists on Plaintiff's Disability Discrimination Claim Under the ADA ............................................................ 31

   i.   A Genuine Dispute of Material Fact Exists as to Whether Defendant Reasonably Accommodated Plaintiff .......................................................... 33

   ii.   A Genuine Dispute of Material Fact Exists as to Whether Defendant's Proffered Reason for Firing Plaintiff was Pretextual ............................... 34

2.   A Genuine Dispute of Material Fact Exists on Plaintiff's ADA Retaliation Claim ...... 37

**V. CONCLUSION** ............................................................................................................ 38

## I.      INTRODUCTION

On February 28, 2022, Plaintiff Kami Smith filed this action against Defendant Presidio Networked Solutions, LLC ("Presidio" or "Defendant") alleging: 1) gender discrimination, disparate pay and hostile work environment claims, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I);  2) gender discrimination and hostile work environment claims, in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA") (Count II); 3) retaliation, in violation of Title VII (Count III);  4) retaliation, in violation of the PHRA (Count IV);  5) disability discrimination, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") (Count V);  and 6) retaliation, in violation of the ADA (Count VI).  (Doc. No. 1.)  Plaintiff alleges that during her employment at Presidio, she was "subjected to a gender-discriminatory environment" as well as sexual harassment, and when she complained, she was forced to share sales commissions with a male co-worker.  (Id. at 1.)  She further alleges that when she informed Presidio of her disabilities of insomnia and anxiety that, according to Plaintiff, were caused by the hostile work environment, Presidio retaliated by terminating her.  (Id.)

On December 20, 2023, the parties filed cross-Motions for Summary Judgment.  (Doc. Nos. 98, 99.)  On May 9, 2024, the Court held a hearing on the cross-Motions for Summary Judgment and requested additional briefing from the parties.  (Doc. No. 139.)  On May 31, 2024, the parties filed supplemental briefs in support of their respective Motions for Summary Judgment. (Doc. Nos. 150, 151.)  The Motions for Summary Judgment (Doc. Nos. 98, 99) are now ripe for disposition and for reasons that follow, Plaintiff's Motion (Doc. No. 98) will be denied in its entirety, and Defendant's Motion (Doc. No. 99) will be granted in part and denied in part.

## II.    BACKGROUND

Plaintiff is a former employee of Presidio, a corporation that sells information technology ("IT") services to businesses.  (Doc. No. 99-1 at 11.)  On October 13, 2013, Presidio hired Plaintiff as an "Account Manager" to sell its IT services to other businesses.  (Id.)  Prior to joining Presidio, Plaintiff had about ten years of sales experience.  (Doc. No. 99-2 at 2.)  In her role as "Account Manager," Plaintiff was assigned to the New York City sales territory and was responsible for selling Presidio's services to businesses in that area, generating additional business from existing "accounts," managing ongoing client relationships, and achieving sales goals set by her manager, Jerry McAvery, the Senior Vice President ("SVP") of sales.  (Id. at 3.)  The term "accounts" refers both to businesses that "Account Managers" had previously sold Presidio's services to, and to businesses they hoped to sell to in the future.  (See id. at 5.)

All account managers at Presidio were compensated through a combination of base salary and commissions.  (Id. at 4.)  Commissions were calculated based on the amount of gross profit an "Account Manager" generated during a given fiscal year.  (Id.)

### A.  Hitachi Deal

In or around May 2018, Plaintiff received a sales lead from Jason Thomas, her friend from high school, who advised Plaintiff of a potential business opportunity for Presidio with Thomas' employer, Hitachi Consulting ("Hitachi").  (Id. at 4.)  Hitachi proposed to Presidio that Presidio act as a subcontractor and provide Hitachi's client Allergan with IT management.  (Id. at 5.)  When Thomas informed Plaintiff of this opportunity, Allergan, a global pharmaceutical company, was already an existing "account" on paper of Presidio, but Allergan had never purchased nor used any services of Presidio.  (Id.)  Further, Allergan was not assigned to Plaintiff's sales territory—the

New York City territory—because Allergan's office was located in the New Jersey sales territory.[1] (Id.)

The "Account Manager" in charge of the New Jersey sales territory was Nigel Baxter. (Id.) Baxter reported to the Lou McElwain, the SVP of sales for New Jersey and Connecticut. (Id.) Baxter was hired by Presidio in June 2016, in part because of his expertise in selling to pharmaceutical companies. (Id. at 6-7.) Prior to Plaintiff's sales lead on Allergan, Baxter had been attempting to sell Presidio's services to Allergan. (Id.)

In June 2018, Presidio assembled a team of employees to pursue the deal with Allergan through Hitachi. (Id. at 7.) The team included Plaintiff, Nigel Baxter, Lou McElwain, Steve Palmese and Joseph Galardi.[2] (Id.) In late July 2018, Hitachi verbally committed the Allergan deal to Presidio, and it was finalized in September 2018. (Id.) The parties dispute Plaintiff's role in the execution of the Allergan deal. (See id.; Doc. No. 98-3 at 1-2.) Plaintiff alleges that because of her role on the team, "the deal with Hitachi progressed and closed quickly" despite Lou McElwain, SVP of sales for the New Jersey territory, "campaign[ing] to take the Hitachi account from [her]" and forcing her to bring Baxter to the meetings with Hitachi and Allergan. (Doc. No. 98-3 at 1-2.) Defendant counters that Plaintiff had never worked on a deal of this size, had no expertise working with pharmaceutical companies, and that McElwain and Baxter "played a significant role in pursuing the Allergan deal." (Doc. No. 99-2 at 7.)

Several notable incidents took place during and shortly after the Allergan deal closed. Defendant alleges that "[b]etween the spring of 2018 and September 2020 – including throughout

---

[1]   Allergan's office was located in Madison, New Jersey. (Id.)

[2]   Steve Palmese was Presidio's SVP of managed service operations, and Joseph Galardi was a Business Development Executive Responsible for pre- and post-sales support for Presidio's Managed IT services. (Id.)

the process of pursing the Allergan Deal – Plaintiff and Mr. Baxter were engaged in a consensual extramarital affair." (Id. at 8.) Plaintiff alleges that after the deal was finalized, "Mr. McElwain made repeated inappropriate comments to Ms. Smith, including, 'Kami, great job, now let the boys handle this. Nigel Baxter doesn't need an assistant in the account.'" (Doc. No. 98-5 at 171:17-19.)

After the deal closed there was also another dispute over how the commission should be shared. (See Doc. No. 99-2 at 8.) At the time, Defendant's policy was to have the SVP of Sales decide how credit would be allocated to "Account Managers" for the purpose of calculating individual commissions. (Id.) The two SVP of sales—Lou McElwain and Jerry McAvery—could not decide whether the deal should be credited to Plaintiff or Nigel Baxter. (Id.; Doc. No. 98-3 at 2.) During this time, Plaintiff told Vinu Thomas, Presidio's Chief Technology Officer, that she believed McElwain's reluctance to give her credit on the Allergan deal was because of her gender. (Doc. No. 99-2 at 9.) Plaintiff also complained of a gender-based hostile work environment to Thomas. (Doc. No. 98-3 at 3.) Plaintiff alleges that Thomas "completed no investigation whatsoever and never reported the conversation to Human Resources." (Id.) Defendant disagrees, stating that "Plaintiff told Mr. Thomas that she did not wish to involve Human Resources ("HR") in this matter." (Doc. No. 99-2 at 9.)

In July 2018, Plaintiff met with Christopher Cagnazzi, Presidio's Tri-State President of Sales, to discuss the commission split. (Doc. No. 98-3 at 2.) On August 2, 2018, Cagnazzi decided that Plaintiff would receive 100% credit for the Hitachi deal, i.e., the current Allergan deal, but Nigel Baxter would receive 100% credit for any future deals that emerged with Allergan. (Doc. No. 99-2 at 10.) On August 29, 2018, Plaintiff sent an email to Cagnazzi changing her position on the commission split. (Id. at 10-11.) The email stated:

Chris,

I wanted to reach out to you to thank you for assisting in the Hitachi issue. It is unfortunate that we had to get you involved . . .

During our discussion, I believe I conveyed my feelings of the importance of working together as a team for the betterment of the company as well as both of us individually. Honestly, part of my motivation was centered around my pregnancy as well. I am concerned that the project might lack the proper attention due to 3rd trimester issues of which I experienced in both pregnancies in the past as well as going on maternity leave. By creating a partnership with Nigel and giving up a piece of the deal, it will assure my project will go smoothly and not create further distain [sic] for Presidio and we can continue to build the business. I feel this is still imperative and forced Nigel to sit down and further discuss a plan where we both win.

We both came to the agreement that this will in fact be messy and neither one of us want that level of negativity in our lives . . . Although I truly appreciate you stepping in to make a decision in an unfortunate situation, I respectfully ask you to give Nigel and I the opportunity to move forward with a new agreement. We agreed that we would split the Hitachi deal 80/20 and Allergan 50/50 pending your approval. Management has also agreed to the new arrangement pending your approval. My deepest apologies for bothering you with this, however, I kindly ask you to agree so we can all successfully move forward.

(Id.)  In sum, Plaintiff was proposing that Baxter would now receive 20% of the current Allergan deal, and she would receive 50% of any future deals that might emerge with Allergan.  (Id. at 11.) On September 10, 2018, Cagnazzi replied, "[a]fter a lot of thought on this and putting my annoyed perspective aside I will approve the below structure" in reference to the commission structure Plaintiff proposed.  (Id.)

Plaintiff claims that shortly after this exchange, she "learned that Presidio was changing the compensation plan for Fiscal Year 2019" and that this change affected her commission on the current Allergan deal. [3]  (Doc. No. 98-3 at 3; Doc. No. 99-2 at 12.)  In short, Presidio changed its compensation plan from 2018 to 2019 by decreasing the "one-time commission payout on all new

---

[3]   The 2019 fiscal year was from July 1, 2018 to June 30, 2019.  (Doc. No. 99-2 at 12.)  The Allergan deal occurred, in part, during the 2019 fiscal year because it was finalized in September 2018.

managed services contracts from 10% to 5%." (Doc. No. 99-2 at 13.) Plaintiff states that this change reduced her commission on the Allergan deal by approximately $200,000. (Doc. No. 98-3 at 3.) Allergan was eventually acquired by another pharmaceutical company, who in mid-2020, terminated Allergan's contract with Presidio. (Doc. No. 99-2 at 13-14.) No additional deals were closed between Presidio and Allergan prior to the termination of the contract. (Id.)

### B. "Peel and Grow" Restructuring

In July 2019, Presidio implemented a restructuring of its sales organization, coined "Peel and Grow." (Id. at 14.) As discussed above, prior to "Peel and Grow," "Account Managers" at Presidio were assigned to a sales territory based on geography. (Id.) Within each sales territory, they worked with all clients and prospective clients, regardless of size. (Id.) After "Peel and Grow," "Account Managers" in each sales territory were divided into smaller teams that focused on clients based on their size. (Id. at 14-15.) For example, "Key Accounts Team" focused on "large, high-value enterprise accounts" and "Named Accounts Team" focused on "mid-market, medium-sized businesses." (Id. at 15.)

During "Peel and Grow," Plaintiff was initially assigned to the New Jersey "Named Account Team." (Doc. No. 98-3 at 4.) While on this "Named Account Team," Plaintiff reported to Joe Waleck, the team's Vice President of Sales. (Doc. No. 98-3 at 4.) In July 2019, Waleck allegedly informed Plaintiff that "she would have to split the Hitachi account with another salesperson moving forward." (Id.) This change led to a dispute between Plaintiff and Waleck. (See id.) They also had disputes over several of Plaintiff's other sales accounts, one of which Plaintiff claims Waleck tried to "take . . . in an aggressive nature." (Doc. No. 99-2 at 20.) Shortly after, Plaintiff was reassigned from the New Jersey "Named Account Team" to the New Jersey "Key Account Team" and retained 100% credit for the Allergan Account. (Id. at 17.) On this

6

team, Plaintiff reported to the Anthony Cali, the group's Senior Vice President of sales and Vince Trama, the Senior Vice President of all "Key Accounts" in the tri-state area.  (Doc. No. 99-2 at 18.)

Plaintiff alleges that every member of the "Key Account Team" had their title changed from "Account Manager" to "Client Executive" except her and the only other woman on the team, Nikelle King.  (Doc. No. 98-3 at 4.)  Defendant agrees that Plaintiff's title was not changed but states that it occurred because of a mistake.  Defendant notes that on August 5, 2019, Plaintiff's title had been changed to "Client Executive" in their internal HR system, but the change never went through because an error occurred that reverted her title back to "Account Manager."  (Doc. No. 99-2 at 18.)  Regardless, Defendant submits that "Client Executives and Account Managers had the same job responsibilities and performed the same function."  (Id.)

In or around October 2019, Plaintiff complained of gender discrimination and retaliation to Presidio's Human Resources ("HR") representative, Anna Gross, but she alleges that Gross did not investigate her claims.  (Doc. No. 98-3 at 4.)

### C. Plaintiff's Performance

Defendant alleges that when Plaintiff moved from the New Jersey "Named Account Team" to the New Jersey "Key Account Team" in July 2019, her supervisor Anthony Cali observed issues with her performance.  (Doc. No. 99-2 at 20.)  For example, Cali testified at his deposition that Plaintiff's performance issues included:

> (i) unprofessionalism; (ii) use of inappropriate language; (iii) lateness and/or failure to appear for meetings; (iv) lack of preparedness for meetings; (v) inability to complete assigned account planning documents in a satisfactory manner; (vi) lack of understanding of her account portfolio; (vii) lack of communication; (viii) failure to cold-call and penetrate or develop her accounts; and (ix) failure to complete assigned tasks, such as submitting expenses in a timely manner.

(Id.)  On March 16, 2020, Cali scheduled a call for the following day with Anna Gross, to discuss Plaintiff's performance issues.  (Id. at 22.)  During the call, Gross and Cali formulated a coaching plan to improve Plaintiff's performance, which he presented to Plaintiff on March 20, 2020.  (Id.)  In approximately mid-March 2020, Presidio closed its offices due to the COVID-19 pandemic moving operations to a fully on-line platform.  (Id. at 23.)

## D. Plaintiff's Mental Health and Leave of Absence

On March 17, 2020, Plaintiff called Anna Gross, the HR representative, to report that she had been experiencing health issues and inquired about taking time off work.  (Doc. No. 98-3 at 4-5.)  Plaintiff reported that she had been suffering from severe anxiety and insomnia since late 2019 and had been treating these conditions since January 2020.  (Id.)  Gross informed Plaintiff that if she wished to take short-term disability leave or leave under the Family and Medical Leave Act ("FMLA"), she needed to open a claim through Guardian Life Insurance Company of America ("Guardian"), Presidio's third-party benefits administrator.  (Doc. No. 99-2 at 23.)

On March 20, 2020, Gross emailed Plaintiff with information regarding how to commence a leave of absence and on Presidio's Paid Time Off ("PTO") policy.  (Id. at 24.)  Between Monday, March 23, 2020, and Friday, March 27, 2020, Plaintiff took five consecutive days of PTO.  (Id.)  On Monday, March 30, 2020, Defendant alleges that Plaintiff did not return to work.  (Id. at 25.)  On March 31, 2020, Plaintiff's supervisor Anthony Cali emailed Plaintiff to inquire about her return-to-work status.  (Id.; Doc. No. 99-52 at 2.)

On April 1, 2020, Plaintiff opened a claim with Guardian for short-term disability and FMLA leave.  (Doc. No. 99-2 at 25.)  Her leave was approved under both short-term disability and FMLA and began on April 9, 2020, with an end date of May 7, 2020.  (Doc. Nos. 98-3 at 5, 99-2

at 25.)  On May 4, 2020, Gross emailed Plaintiff to inquire whether Plaintiff intended to return to work on May 7.  (Doc. No. 99-2 at 25.)  Plaintiff replied that:

> My Dr has not approved my return to work date and has faxed a copy of my updated medical records etc on Monday as requested by Guardian . . . As of right now, I do not have return to work date at this time and should be determined by my Dr as I'm continuing my medical treatment.  I am meeting with my Dr today and will provide any additional information that is not included in this email if applicable.

(Doc. No. 99-55 at 2.)  On May 19, 2020, Guardian extended Plaintiff's short-term disability and FMLA leave of absence to May 31, 2020.  (Doc. No. 99-2 at 26.)

On May 26, 2020, Plaintiff's Doctor, Dr. Brookman, faxed a letter to Guardian requesting an extension of Plaintiff's leave of absence.  (Id.)  In the letter he stated that Plaintiff's next appointment with him was June 3, 2020, and at that appointment he "will try to determine how much longer [he] expect[s] [Plaintiff] to be away from her place of employment."  (Doc. No. 99-57 at 3.)

On June 8, 2020, Dr. Brookman faxed a second letter stating that Plaintiff "has made remarkable improvements since placing her on short term disability" and that he believes "that she will be able to return to work starting July 3, 2020."  (Doc. No. 99-58 at 4.)  On July 2, 2020, Plaintiff received an email from Guardian stating that her leave would end on July 7, 2020.  (Doc. No. 99-59 at 3.)  On July 3, 2020, Dr. Brookman faxed a letter to Guardian stating that:

> [Plaintiff] continues to make progress but it is not to the point where I feel she can return to work.  If sent back too soon, I fear she will lose the gains in her health that she has made to date.

(Doc. No. 99-67.)  Dr. Brookman also stated that he ordered two tests, and he "should have these tests results by her next appointment which is scheduled for[] 07/14/2020."[4]  (Id.)  He concluded

---

[4]  Dr. Brookman stated that the two tests he ordered were "ZRT Labs testing for neurotransmitters and Genova Diagnostics testing for Organix Comprehensive Profile."  (Id.)

that "[o]nce I have the data from the above ordered tests, I should have a better idea of where [Plaintiff] stands and whether or not she is ready to return to work."  (Id.)

On July 7, 2020, Anna Gross emailed Plaintiff inquiring whether Plaintiff had extended her leave past July 2, 2020.  (Doc. No. 99-68 at 3.)  Gross also asked Plaintiff when she intended to return to work.  (Id.)  On July 8, 2020, Plaintiff replied, stating "I would like to discuss, what is the best time to speak tomorrow?"  (Id. at 2-3.)  On July 9, 2020, Gross responded with her availability.  (Id. at 2.)  On the same day, Plaintiff replied that she "received [Gross's] email too late" and asked about her availability for a call on July 10, 2020.  (Id.)  On July 10, 2020, Gross replied with her availability for a call.  (Id.)  Following this email, the parties dispute whether a call took place between Gross and Plaintiff on July 10, 2020.  (See Doc. No. 99-2 at 28-30.)

On July 10, 2020, Plaintiff received an email from Guardian stating that its "information shows that you will be returning to work on 7/15/2020."  (Doc. No. 99-73 at 3.)  On the same day, Gross received a similar letter from Guardian informing her of Plaintiff's return to work date of 7/15/2020.  (Doc. No. 99-74 at 3.)

On July 14, 2020, in an email received at 6:12 p.m. from Anna Gross, Presidio terminated Plaintiff's employment, effective the next day.  (Doc. No. 98-6 at 3.)  The email stated:

> Per the letter you received from Presidio's FML Administrator, Guardian on July 2, 2020, you have exhausted your job protected leave for Employee Health Condition, as covered under the Family and Medical Leave Act (FMLA), state leave law(s), and/or company leave policies as of July 3, 2020.
>
> Presidio's obligation under the Family Medical Leave Act has been fulfilled and your former position is no longer available to you.
>
> Furthermore, your benefits under Presidio's Short Term Disability plan have ended on July 14, 2020.  Since you are no longer on an approved leave of absence and we have not heard from you since July 9, 2020, your employment will terminate on July 15, 2020.

(Id.)  After this email was sent, Plaintiff texted Dr. Brookman at approximately 10:37 p.m. that "[w]e need to talk immediately" and "I need that paperwork faxed over to G[u]ardian tomorrow" because "that's my last day of work and they screwed up with the dates."  (Doc. No. 99-75 at 3.) On July 15, 2020, Plaintiff faxed a letter from Dr. Brookman to Guardian.  (Doc. No. 99-76 at 2.) In Dr. Brookman's letter dated July 14, 2020, he stated that Plaintiff came to his office that day for a follow up visit, and he opined that based on his findings, "she is not ready to return to work." (Id. at 4.)  He further stated that his next appointment with her is scheduled for August 11, 2020 and that "[h]er sick leave should be extended to at least 08/18/2020."  (Id.)

Following this fax, Plaintiff had no additional contact with Presidio.  (See Doc. No. 99-2 at 32.)  On May 7, 2020, Plaintiff dual filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC").  (Doc. No. 1.)

### III.   STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material,"

it "must have the potential to alter the outcome of the case." <u>Favata</u>, 511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." <u>Id.</u> (quoting <u>Azur</u>, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Id.</u> (alteration in original) (quoting <u>Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.</u>, 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. <u>Anderson</u>, 477 U.S. at 247-49. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the court must credit the nonmoving party's evidence over that presented by the moving party. <u>Id.</u> at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. <u>Id.</u> at 250.

Here, the parties filed cross-motions for summary judgment. "The same standards and burdens apply on cross-motions for summary judgment." <u>Allah v. Ricci</u>, 532 F. App'x 48, 50 (3d Cir. 2013). When the Court is confronted with cross-motions for summary judgment:

> [T]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard. If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.

Hussein v. UPMC Mercy Hosp., No. 2:09-cv-00547, 2011 WL 13751, at *2 (W.D. Pa. Jan. 4, 2011), aff'd, 446 F. App'x 108 (3d Cir. 2012) (second alteration in original) (internal quotation marks and citations omitted).

## IV. ANALYSIS

As noted previously, Plaintiff alleges various claims set forth in her Complaint against Defendant: 1) gender discrimination, disparate pay and hostile work environment claims, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I); 2) gender discrimination and hostile work environment claims, in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA")  (Count II); 3) retaliation, in violation of Title VII (Count III); 4) retaliation, in violation of the PHRA (Count IV); 5) disability discrimination, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") (Count V); and 6) retaliation, in violation of the ADA (Count VI).   (Doc. No. 1.)  Both parties move for summary judgment, and the Court will address their arguments in turn.[5]

### A.  Timeliness and Exhaustion of Plaintiff's Claims Under the PHRA and Title VII

Defendant argues that summary judgment should be granted in its favor on Plaintiff's PHRA and Title VII claims (Counts I, II, III and IV) for three reasons.  First, Defendant submits that the PHRA claims (Counts II and IV) are time-barred as a matter of law.  Second, it argues that

---

[5]  In Plaintiff's Motion for Summary Judgment (Doc. No. 98), she moves for summary judgment on four claims: 1) gender-based hostile work environment claims, under Title VII (Count I); 2) disability discrimination claim and failure to accommodate claim, in violation of the ADA (Count V); 3) retaliation, in violation of Title VII (Count III); and 4) retaliation, in violation of the ADA (Count VI).  (Id.)

In Defendant's Motion for Summary Judgment (Doc. No. 99), it moves for summary judgment on all the claims in Plaintiff's Complaint.  (Id.)

the majority of Plaintiff's Title VII claims (Counts I and III) are time-barred as a matter of law.[6]

Third, to the extent some Title VII claims are not time-barred, Defendant argues that they were

not administratively exhausted.   The Court will address Defendant's arguments in <u>seriatim</u>,

viewing the facts in the light most favorable to Plaintiff at this stage of the litigation.

    1.  <u>Plaintiff's Claims Under the PHRA are Untimely</u>

Defendant first submits that Plaintiff's gender discrimination, hostile work environment

and retaliation claims brought under the PHRA in Counts II and IV are untimely.   The Court agrees

and will dismiss Counts II and IV of Plaintiff's Complaint.

To bring suit under the PHRA for gender discrimination and hostile work environment, a

plaintiff must file a complaint with the Pennsylvania Human Relations Commission ("PHRC")

"within 180 days of the alleged act of discrimination."   <u>Yeager v. UPMC Horizon</u>, 698 F. Supp.

2d 523, 535 (W.D. Pa. 2010).   "Any acts that occurred prior to [that] [] date[] are barred from

consideration."   <u>Kimes v. University of Scranton</u>, 126 F. Supp. 3d 477, 492 (M.D. Pa. 2015) (citing

<u>Mikula v. Allegheny Cnty. of Pa.</u>. 583 F.3d 181, 183 (3d Cir. 2009)).   "If a plaintiff fails to file a

timely complaint with the PHRC, then he or she is precluded from judicial remedies under the

---

[6]  Defendant alleges that Plaintiff's gender discrimination and hostile work environment claims, in
violation of Title VII (Count I), are time-barred.   (Doc. No. 99-1 at 28.)   It recognizes, however,
that Plaintiff's disparate pay claim based on gender discrimination, in violation of Title VII (Count
I), and her retaliation claim, in violation of Title VII (Count II), are not time-barred.   With respect
to these latter claims, Defendant asserts, however, that Plaintiff failed to administratively exhaust
her hostile work environment claim (Count I).   (<u>Id.</u>)   Because Plaintiff did not administratively
exhaust her hostile work environment claim, it will be dismissed.   This claim is discussed in
Section IV(A)(3) <u>infra</u>.   Regarding her disparate pay claim (Count I), Defendant argues that
Plaintiff has not administratively exhausted this claim too.   This argument is without merit for
reasons stated in Section IV(A)(3) <u>infra</u>.   But Defendant also argues that summary judgment should
be granted in its favor on the disparate pay claim after applying the <u>McDonnell Douglas</u>
framework.   This argument is meritorious for reasons stated in Section IV(B)(3) <u>infra</u>.

PHRA." Yeager, 698 F. Supp. 2d at 535 (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997), cert. denied 522 U.S. 914 (1997)).

Here, Plaintiff dual-filed an administrative complaint with the PHRC and the EEOC on May 7, 2021.  (Doc. No. 1 at 5.)  Thus, following the PHRA's 180-day look back rule, an act of discrimination had to have occurred after November 8, 2020 for her claim to be timely.  However, Plaintiff was terminated as an employee on July 15, 2020, and alleges no discriminatory acts nor contact with Defendant after that date.  (See Doc. No. 1.)  Accordingly, even when the facts are viewed in the light most favorable to Plaintiff, her PHRA claims are time barred because she alleges no discriminatory acts after July 15, 2020.  Summary judgment therefore will be granted in Defendants favor on Counts II and IV of the Complaint and those Counts will be dismissed.

2.  Plaintiff's Gender Discrimination Claim Under Title VII is Timely Under the "Continuing Violations Doctrine"

Defendant raises a similar timeliness argument against Plaintiff's gender discrimination claim under Title VII (Count I).  Plaintiff counters that this claim should not be dismissed because the continuing violations doctrine exception to the timeliness requirement applies.[7]  (Doc. No. 104 at 17.)  The Court agrees and finds that the continuing violation doctrine applies, and therefore the gender discrimination claim was timely.

"To bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice."  Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013) (citing 42 U.S.C.

---

[7]  The continuing violations doctrine does not apply to Plaintiff's PHRA claims because the doctrine requires that Plaintiff show "that at least one act occurred within the filing period."  Kimes, 126 F. Supp. 3d at 492.  Here, Plaintiff was fired during Title VII's 300-day lookback period, but no acts occurred during the PHRA's 180-day lookback period.

§ 2000e-5(e)(1)). "Any acts that occurred prior to [that] [] date[] are barred from consideration."

Kimes, 126 F. Supp. 3d at 492 (citing Mikula, 583 F.3d at 183). "This rule does not apply,

however, when the defendant's unlawful conduct has been part of an ongoing practice." Id. (citing

Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001)). This exception to the 300-day

requirement for ongoing unlawful conduct is known as the "continuing violations doctrine." See

e.g., Yeager, 698 F. Supp. 2d at 540. As the court explained in Kimes:

> Under the continuing violation doctrine, "when a defendant's conduct is part of a
> continuing practice, an action is timely so long as the last act evidencing the
> continuing practice falls within the limitations period; in such an instance, the court
> will grant relief for the earlier related acts that would otherwise be time barred."
> [Cowell, 263 F.3d at 292] (quoting Brenner v. Local 514, United Bhd. of Carpenters
> & Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991)). The United States Court
> of Appeals for the Third Circuit has set forth a two part test to determine whether
> the continuing violation doctrine applies to a given case. "First, [the plaintiff] must
> demonstrate that at least one act occurred within the filing period . . . Next, the
> plaintiff must establish that the [alleged wrong] is more than the occurrence of
> isolated or sporadic acts." West v. Phila. Elec. Co., 45 F.3d 744, 755 (3d Cir. 1995).

126 F. Supp. 3d at 492.

Here, Plaintiff dual filed an administrative complaint with the PHRC and the EEOC on

May 7, 2021. (Doc. No. 1 at 5.) Thus, following Title VII's 300-day lookback rule, for her claim

to be timely, an act of discrimination had to occur after July 11, 2020. Turning to Plaintiff's

Complaint, she alleges that she was terminated because of discrimination on July 15, 2020. (Doc.

No. 99-2 at 1.)

In analyzing this claim and viewing the evidence in the light most favorable to Plaintiff at

the summary judgment stage of litigation, Plaintiff has satisfied the first step of the continuing

violation doctrine by showing that a discriminatory act, her firing, took place after July 11, 2020.

Next, again using the summary judgment standard, Plaintiff must satisfy the second step—"that

the [alleged wrong] is more than the occurrence of isolated or sporadic acts." <u>Kimes</u>, 126 F. Supp.

3d at 492 (quoting <u>West</u>, 45 F.3d at 755).  As the Court discussed in <u>Kimes</u>:

> In resolving the second step, courts should consider: "(1) subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency—whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence[.]" <u>Cowell</u>, 263 F.3d at 292 (citing <u>West</u>, 45 F.3d at 755, n. 9).
>
> . . .
>
> Although the continuing violation doctrine applies in numerous situations, it has particular vitality in the employment discrimination context, where the plaintiff's claim "is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant." [<u>O'Connor v. City of Newark</u>, 440 F.3d 125, 128 (3d Cir. 2006)].  "In such cases, obviously the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement." <u>Id.</u> (citing [<u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002)]).

<u>Id.</u>  In <u>Kimes</u>, the court applied these considerations to evaluate whether the continuing violation

exception applies to untimely claims of gender discrimination.  <u>Id.</u>  There, the court reasoned that

the plaintiff's termination could serve as the qualifying act to bring in untimely acts because:

> [t]he statements and actions taken by [plaintiff's] supervisors were all connected to a single thread—an apparent belief that women were inherently incapable of performing the duties associated with being a police officer, and assigning tasks that were, in their eyes, more suitable for women.  Moreover, these acts were not isolated, but were continuous and ongoing through at least the year and a half prior to [plaintiff's] termination.

<u>Id.</u> at 493; <u>see also</u> <u>Hanafy v. Hill International, Inc.</u>, 669 F. Supp. 3d 419, 431 (E.D. Pa. 2023)

(finding that termination could serve as the qualifying act to bring in untimely acts) (citing <u>Morgan</u>,

536 U.S. at 114).

     Here, in viewing the evidence in the light most favorable to Plaintiff, she has shown that

the following actions occurred, that she claims amount, to a pattern of discriminatory conduct at

Presidio: that she was forced "to bring a male account manager to accompany her to her in-person

meeting with Hitachi and end-user Allergan" (Doc. No. 98-3 at 2); Lou McElwain's repeated "inappropriate comments to [Plaintiff] including 'Kami, great job, now let the boys handle this. [Baxter] does not need an assistant on this file'" (Id.); the dispute over commission allegedly fueled by gender; Joe Waleck taking Plaintiff's sales accounts away and Plaintiff, as well as the only other woman on her team, not receiving the title change with her male coworkers. (Id.)

These acts appear similar to the acts in <u>Kimes</u> that the court found were a continuing violation. Like the plaintiff in <u>Kimes</u>, Plaintiff was treated differently because of her gender which Plaintiff alleges was fueled by a belief that she was inferior to her male coworkers. The actions against Plaintiff also were ongoing—they continued during the course of her employment until she took medical leave. They culminated in her termination on July 15, 2020, within the 300-day lookback rule. Accordingly, since the continuing violation doctrine applies to Plaintiff's Title VII gender discrimination claim and her termination could serve as a qualifying act to bring in untimely acts, Defendant's argument that this claim is time-barred is without merit at this stage of the litigation.

### 3.  Administrative Exhaustion of Plaintiff's Title VII Claims

Defendant next argues that Plaintiff's Title VII hostile work environment and disparate pay claims must be dismissed because Plaintiff failed to administratively exhaust them. (Doc. No. 99-1 at 29.) Specifically, Defendant alleges that Plaintiff failed to include claims of hostile work environment and disparate pay in her EEOC charge. (Id.)

Regarding the administrative exhaustion requirement, the Third Circuit Court of Appeals noted in <u>Barzanty v. Verizon PA, Inc.</u> that:

> A plaintiff bringing an employment discrimination claim under Title VII must comply with the procedural requirements set forth in 42 U.S.C. § 2000e–5. Before filing a lawsuit, a plaintiff must exhaust her administrative remedies by filing a timely discrimination charge with the EEOC. <u>Id.</u> §§ 2000e–5(b), (e)(1), (f)(1). The

18

EEOC will then investigate the charge, and the plaintiff must wait until the EEOC issues a right-to-sue letter before she can initiate a private action. Burgh v. Borough Council, 251 F.3d 465, 470 (3d Cir. 2001). The ensuing suit is limited to claims that are within the scope of the initial administrative charge. Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996). "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." Id.

After a charge is filed, "the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . .'" Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978) (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398–99 (3d Cir. 1976)); see also Antol, 82 F.3d at 1295; Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984). Although this standard does not necessarily preclude a plaintiff from asserting a claim for the mere failure to check a box on an EEOC Charge Form, it does prevent a plaintiff from "greatly expand[ing] an investigation simply by alleging new and different facts when [s]he [is] contacted by the Commission following [her] charge." Hicks, 572 F.2d at 967. Because the EEOC is required to serve notice on the employer against whom the charges are made, this standard also allows an employer to be put on notice of the claims likely to be filed against it. See 42 U.S.C. §§ 2000e–5(b), (e)(1).

361 Fed. Appx. 411, 413-14 (3d Cir. 2010).

Here, in viewing the evidence in the light most favorable to Plaintiff during the summary judgment stage, Plaintiff did not administratively exhaust her hostile work environment claim.[8] Her hostile work environment claim is based on inappropriate sexual contact and touching.[9] But

---

[8]   To establish a prima facie hostile work environment claim under Title VII, a plaintiff must show:

>   (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

Burgess v. Dollar Tree Stores, Inc., 642 Fed. Appx. 152, 154-55 (3d Cir. 2016) (quoting Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009)).

[9]   In her Motion for Summary Judgment, Plaintiff alleges that she established all five elements of a hostile work environment because:

her EEOC charge is devoid of any such allegations.  (See Doc. No. 99-77).  In her deposition, Plaintiff alleged that between October 2013 and March 2020, fellow employees at Presidio: (i) hugged her; (ii) touched her on the waist; (iii) "smacked" her on the rear on one occasion; (iv) stared at her; (v) complimented her outfits and asked her how she lost weight so quickly after her pregnancies; and (vi) commented on her relationship with Nigel Baxter by asking her where they would go to dinner and what hotels they frequented.  (Doc. No. 99-9 at 74:9-79:20, 83:20-84:13, 93:21-95:21, 98:2-99:1, 99:16-100:5, 101:7-21, 329:15-25, 331:19-23, 332:7-16, 334:3-17, 336:6-19; 337:12-21, 338:8-22, 339:14-24, 343:2-14, 346:9-347:14, 610:6-611:16).  None of these allegations, nor any similar ones that would have put Presidio on notice that conduct of this nature occurred, was included in the EEOC complaint.  See McGinnis v. Donahoe, Civ. No. 12-cv-1880, 2015 WL 507043 at *13 (W.D. Pa. Feb. 6, 2015) (dismissing hostile work environment claim because it was not in the scope of Plaintiff's EEOC charge).  Rather, Plaintiff's EEOC charge only described the conflict surrounding the Allergan deal, commission disputes, conflicts around "peel and grow" and the circumstances surrounding her medical leave.  (See Doc. No. 99-77.)  Because there is no mention at all of the acts supporting the hostile work environment claim, Plaintiff failed to administratively exhaust her administrative remedies on this Title VII claim, and it will be dismissed.

---

A reasonable person in Ms. Smith's situation would most definitely find her work environment to be hostile. It is patently offensive to be regularly and consistently commented about in a sexual manner. Any reasonable woman in Ms. Smith's situation would find such an environment hostile, uncomfortable, and humiliating.

Ms. Smith can establish prong two because of the frequency with which she was subjected to inappropriate contact in the workplace. Ms. Smith testified in her deposition that the gender-inappropriate conduct and touching happened so frequently that they were practically a daily occurrence.

(Doc. No. 98-2 at 10.)  Accordingly, Plaintiff is basing her hostile work environment claims on inappropriate contact and sexual comments.

But, in viewing the evidence in the light most favorable to Plaintiff on her disparate pay claim, she did administratively exhaust her administrative remedies on this claim.  As discussed above, the scope of Plaintiff's present action is "'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . .'"  Hicks v. ABT Assoc., Inc., 572 F.2d at 966 (quoting Ostapowicz, 541 F.2d at 398–99).  Here, Plaintiff's EEOC claims reasonably put Defendant on notice about her disparate pay claims.  For example, in her EEOC charge Plaintiff stated that Lou McElwain "started an aggressive campaign to assign Hitachi to his team and remove it from me."  (Doc. No. 99-77 at 3.)  Because Presidio pays commission to its employees, a reasonable jury could find that an attempt to remove sales accounts could result in disparate pay.  Accordingly, Plaintiff administratively exhausted her disparate pay claim, but did not administratively exhaust her hostile work environment claim. [10]

## B.  Plaintiff's Title VII Claims

As discussed above, Plaintiff's PHRA Claims (Counts II and IV) and hostile work environment claim under Title VII will be dismissed.  Accordingly, viewing the evidence in the light most favorable to Plaintiff at the Summary Judgment stage, the Court will now address Plaintiff's Title VII claims—gender discrimination, retaliation and disparate pay—which remain at this point.

---

[10]  Plaintiff also asserts that Defendant waived its administrative exhaustion defense to her hostile work environment and disparate pay claims because it failed to raise this defense prior to summary judgment.  (Doc. No. 160 at 17.)  However, "[a] party waives a defense only if it fails to raise it by motion and does not include it in responsive pleading."  Barzanty, 361 Fed. Appx. at 415 (citing F.R.C.P. 12(h)).  Here, Defendant included this defense in its Motion for Summary Judgment (Doc. No. 99).  Accordingly, Defendant did not waive its objection for failure to exhaust administrative remedies.  See id. (holding that defendant properly raised its objection for failure to exhaust administrative remedies at the summary judgment phase).

1. <u>Gender Discrimination</u>

To prove a gender discrimination claim when, as here, there exists no direct evidence of discrimination, a plaintiff must satisfy the three-step burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802. Under this three-step analysis:

> <u>McDonnell Douglas</u> requires the plaintiff to shoulder the initial burden to make out a prima facie case of discrimination. If the plaintiff meets this requirement, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory rationale for the employment action. Should the defendant satisfy its burden, the presumption of discriminatory action is rebutted and the plaintiff must demonstrate that the defendant's stated reasons are pretextual.

<u>Wood v. Univ. of Pittsburgh</u>, 395 F. App'x 810, 814 (3d Cir. 2010) (citing <u>Wishkin v. Potter</u>, 476 F.3d 180, 185 (3d Cir. 2007)).

i. Prima Facie Case

Although the elements of a prima facie case "depend on the facts of the particular case," a plaintiff in a Title VII discrimination case must generally demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered from some form of adverse employment action; and (4) those actions were taken under circumstances that give rise to an inference of unlawful discrimination. <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410–11 (3d Cir. 1999). In this analysis, the focus "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 352 (3d Cir. 1999) (quoting <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577, (1978)). Therefore, the plaintiff must produce "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 161 (3d Cir. 1999).

Under the fourth prong of a prima facie case, a plaintiff must "establish some causal nexus between [her] membership in a protected class and the decision" to fire her. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003). In other words, the plaintiff's gender must have been a "determinative factor" in the defendant's decision to terminate her employment. Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000). This requires that the plaintiff submit "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." Pivirotto, 191 F.3d at 356 (quoting O'Connor, 517 U.S. at 312).

Here, the first three elements are not in dispute. Plaintiff is a member of a protected class and was qualified in her job as an "Account Manager" for Presidio. Defendant Presidio took adverse action against Plaintiff by terminating her employment. The only dispute is whether the circumstances of her termination gave rise to an inference of unlawful discrimination.

Viewing the facts in the light most favorable to Plaintiff, she has demonstrated that the circumstances of her termination give rise to an inference of discrimination based on gender. As discussed in Section IV(A)(2) supra, the proffered evidence shows that Plaintiff was treated differently than her male colleagues, resulting in losing sales accounts and being given different titles. Given those facts, a jury could reasonably conclude that Defendant treated Plaintiff less favorably than her male colleagues based on gender, resulting in her termination. Therefore, at this stage, she has established a prima facie case of gender discrimination.

ii.   Nondiscriminatory Reason for Termination

Since a jury could find that Plaintiff established a prima facie case of discrimination, the burden shifts to the Defendants to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 142, (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, (1993)).

Here, viewing the evidence in the light most favorable to Defendant, it has articulated legitimate, nondiscriminatory reasons for Plaintiff's termination and has thus satisfied the second prong of the burden-shifting framework. Defendant argues that Plaintiff did not inform Presidio whether she intended to resume her job duties following the expiration of her leave, and it chose to terminate her consistent with its Leaves of Absence policy. See Castellani v. Bucks Cnty. Mun., 351 F. App'x 774, 777-78 (3d Cir. 2009) (plaintiff's failure to return to work following expiration of her FMLA leave was legitimate, nonretaliatory reason for termination); Johnson v. Cmty. Coll. of Allegheny Cnty., 566 F. Supp. 2d 405, 439 (W.D. Pa. 2008) (plaintiff was appropriately terminated for failing to work after expiration of FMLA leave, particularly where employer's policies advised plaintiff that such failure could result in termination).

In finding that Defendant has articulated a legitimate and nondiscriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff to show that Defendant's proffered reason for terminating Plaintiff was pretextual.

### iii.    Pretext for Discrimination

In the third and final step of the McDonnell Douglas analysis, the burden shifts back to plaintiff to produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." Harding v. CareerBuilder, LLC, 168 Fed. App'x. 535, 538 (3d Cir. 2006) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir.1996)). The Third Circuit has articulated three possible ways to make this showing. See Harding, 168 Fed. App'x. at 538. A plaintiff can submit evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not

24

actually motivate his discharge, or (3) that they were insufficient to motivate discharge."  Id.  Here, there is a genuine dispute of material facts as to whether Plaintiff established pretext under the McDonnell Douglas analysis and accordingly, both parties' Motions for Summary Judgment on this claim will be denied.

As discussed above, Defendant submits that it terminated Plaintiff's employment because her short-term disability leave terminated, and it had not heard from Plaintiff on whether she planned to return to work.  However, there is a genuine dispute of material fact on whether Plaintiff was in communication with Defendant's HR representative, Anna Gross, prior to being fired.  Plaintiff argues that "it is undisputed that [Plaintiff] informed Ms. Gross on or about July 1, 2020, that she had a doctor's appointment on July 14, 2020" and that Plaintiff "told Ms. Gross that she intended to extend her leave of absence for a third time."  In support of these allegations, Plaintiff states that she talked with Gross regarding the status of her return on July 1, July 9 and July 10 of 2020.  Defendant disagrees, stating that Plaintiff failed to communicate with Defendant regarding her work status or make any additional request for accommodation.  Because the parties factually dispute whether Plaintiff communicated with Defendant prior to her termination, summary judgment for either party on the claim of gender discrimination in violation of Title VII will not be granted.

2.  Retaliation

In Count III, Plaintiff brings retaliation claims under Title VII,[11] alleging that she lost sales accounts and was terminated for voicing complaints that she was being discriminated against

---

[11]  Under Title VII, an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter."  42 U.S.C. § 2000e-3(a).

because of her gender.  For claims of retaliation under Title VII, courts apply the same <u>McDonnell Douglas</u> burden-shifting approach.  <u>See</u> <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 342 (3d Cir. 2006).

Hence, after a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." <u>Moore</u>, 461 F.3d at 342 (3d Cir. 2006) (citing <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500–01 (3d Cir. 1997)).  In this case, Plaintiff alleges that Presidio violated Title VII by retaliating against her in response to her complaints of Defendant's gender discrimination against her.

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action.[12]  <u>Carvalho-Grevious v. Delaware State Uni.</u>, 851 F.3d 249, 257 (3d Cir. 2017).  Under the third prong, "a plaintiff must introduce evidence about the 'scope and nature of conduct and circumstances that could support the inference' of a causal connection." <u>Id.</u> (citing <u>Collins</u>, 2017 WL 4074535, at *4.)

Here, again viewing the evidence as favorable to her, Plaintiff established the first prong because she engaged in protected activities when she lodged complaints of gender discrimination with Vinu Thomas, Presidio's Chief Technology Officer and Anna Gross, Presidio's HR representative.  For the second prong, Plaintiff alleges that Defendant took adverse action against

---

[12]  A plaintiff must show that his participation in protected activity was the but-for cause of any alleged adverse employment action he suffered.  <u>See</u> <u>Univ. of Texas v. Univ. of Tex. Southwestern Med. Ctr. v. Nassar</u>, 570 U.S. 338 (2013).

Plaintiff when Defendant took key accounts away from her, including "Allergan, Hitachi Consulting, Apollo and Weichert" and fired her.  (Doc. No. 107 at 9; see also Doc. No. 98-2 at 16.)  These acts are sufficient to show adverse employment action.  Plaintiff's real challenge, however, is that she cannot establish the third prong—i.e., the requisite casual connection between her complaints and the purported loss of any accounts.  (Doc. No. 103 at 31.)  The Court agrees.

For purposes of the third prong of a prima facie case of retaliation, temporal proximity can satisfy this prong when it is found that the timing between a complaint and an adverse employment action is "unduly suggestive."  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012) (holding that the temporal proximity was unduly suggestive where the plaintiff was terminated seven days after she engaged in protected activity).  "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity," courts typically look to the see if the number of days alleged between the complaint and the adverse action is in the "realm of what this Court and others have found sufficient at the prima facie stage."  Id. (quoting Leboon, 503 F.3d at 233); see e.g., Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding two days unduly suggestive); Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283 (6th Cir. 2012) (finding three weeks unduly suggestive); Wierman v. Casey's Gen. Stores, 638 F.3d 984, 994 (8th Cir. 2011) (finding four days unduly suggestive).

Here, Plaintiff alleges that she complained to Vinu Thomas in July 2018 and to Anna Gross in October 2019 about gender discrimination at Presidio.  (Doc. No. 98-3 at 3-4.)  Plaintiff also alleges that in response, Defendant retaliated against her by removing the key accounts of "Allergan, Hitachi Consulting, Apollo and Weichert" from her in July 2019.  (Doc. No. 107 at 9.)  Defendant notes that while Plaintiff alleges that Waleck attempted to "take" the Allergan/Hitachi account from her, he was not successful in doing so.  (Doc. No. 151 to 18-19.)  Regarding her

27

termination on July 15, 2020, Defendant argues that this act occurred about nine (9) months after she complained to Anna Gross, Presidio's HR representative.

Regardless, there is no "temporal proximity" between any of these alleged adverse acts and her complaints for two reasons. First, there was no retaliation after her July 2018 complaint to Vinu Thomas because after her complaint to Thomas, Plaintiff was ultimately awarded 100% credit of the Allergan/Hitachi deal by Cagnazzi. Second, as discussed above, Plaintiff alleges that Waleck attempted to "take" four accounts from her in July 2019.[13] But she alleges that she complained to Thomas in July 2018, almost a full year before the July 2019 conflict with Waleck. Further, her October 2019 complaint to Gross was after Waleck attempted to take the accounts. In sum, in viewing the facts in the light most favorable to Plaintiff, there is no genuine dispute of material fact raised in Plaintiff's retaliation claim because she cannot show that there was a causal connection between the protected activity and the adverse action. Simply put, the dates between her complaints and the adverse actions are too far apart to establish a causal connection.

Finally, to the extent that Plaintiff is alleging retaliatory termination, this claim fails for the same reason. As discussed above, Plaintiff complained to Anna Gross in October 2019. However, she was not terminated until July 15, 2020, approximately eight months later. This span of time does not satisfy the "temporal proximity" requirement to show a causal connection.

---

[13]  Specifically, Plaintiff alleges that Joe Waleck informed her in July 2019 that she "would have to split the Hitachi account with another salesperson moving forward." (Doc. No. 98-3 at 4.) Plaintiff mentions the Apollo and Weichert accounts in her deposition. She testified:

> At that point, you know, I was threatened that Apollo was going to be taken away from me, and the same day I was being told that 50 percent of Allergan needed to be taken away from me, and then only a few weeks later from me I'm being told that Weichert is being taken from me.

(Doc. No. 98-5 at 117:23-118:5.)

In sum, Plaintiff has not alleged any facts sufficient to satisfy the third prong of a prima facie case of a Title VII retaliation claim.  Consequently, summary judgment will be granted in favor of Defendant on this claim (Count III).

3.  Disparate Pay

Plaintiff also brings a disparate pay discrimination claim in Count I, alleging that Defendant violated Title VII by engaging in "different treatment regarding standing, benefits, bonuses, commissions, position and other benefits of employment than similarly situated males."[14] (Doc. No. 1 at 15.)

The McDonnell Douglas burden shifting framework applies to these claims.  Summy-Long v. Pennsylvania State University, 715 Fed.Appx. 179, 182 (3d Cir. 2017).  With disparate pay claims, the court applies the same prima facie analysis as it does for a gender discrimination claim: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered from some form of adverse employment action; and (4) those actions were taken under circumstances that give rise to an inference of unlawful discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir. 1999).

As discussed previously, there is no dispute that Plaintiff established the first three elements of her prima facie case.  Rather, Defendant challenges the fourth element—i.e., whether the circumstances surrounding her alleged pay discrimination support an inference of discrimination.  And even if the fourth element is met, Defendant further argues that Plaintiff cannot show that Defendant's proffered reason for any pay disparity is pretextual.  The Court

---

[14]  Pursuant to Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

agrees, and because this claim will be disposed of based on the second (reason for disparity) and third (pretext) prongs of <u>McDonnell Douglas</u>, the Court need not discuss whether Plaintiff established a prima facie case.

Here, Plaintiff's claim is based on the allegation that she was paid less than Nigel Baxter until her employment was terminated on July 15, 2020.  Defendant agrees that Baxter was paid more than Plaintiff, but argues that it gave appropriate reasons, under the second step of <u>McDonnell Douglas</u>, for why Baxter was paid more, and that Plaintiff made no attempt to establish that these proffered reasons are pretextual under the final <u>McDonnell Douglas</u> step.  Specifically, Defendant states:

> it is undisputed that Mr. Baxter: (i) had twelve more years of sales experience than Plaintiff, including experience working with major global technology companies that Plaintiff lacked (SUMF ¶¶ 8, 35; ECF No. 104-1 at ¶¶ 8, 35); and (ii) was hired specifically for his depth of experience in the pharmaceutical industry, which Plaintiff lacked (SUMF ¶¶ 29, 33, 39; ECF No. 104-1 at ¶¶ 29, 33, 39). It is also undisputed that Presidio was required to spend approximately one year recruiting Mr. Baxter away from a lucrative role at a competitor, while Plaintiff joined Presidio because she was dissatisfied with her current role and seeking a new opportunity. (SUMF ¶¶ 9, 28-34; ECF No. 104-1 at ¶¶ 9, 28-34). As set forth in Presidio's Briefing, Mr. Baxter's experience, pharmaceutical expertise, and challenging recruitment process are all legitimate, non-discriminatory reasons for a pay differential as a matter of law. (ECF No. 99-1 at 23-26). Significantly, Plaintiff has never made any attempt to show, as she must, that these reasons are pretextual. (<u>Id.</u>). Indeed, Plaintiff has completely neglected to address her disparate pay claim in any of her summary judgment briefing, and also failed to do so at oral argument. (ECF Nos. 98-2, 104, 107; OA Tr. at 50).  Plaintiff's Title VII disparate pay claim must accordingly be dismissed.  <u>Summy-Long v. Pa. State Univ.</u>, 715 F. App'x 179, 183 (3d Cir. 2017) (affirming summary judgment where plaintiff "failed to respond with any affirmative evidence that [her employer's] explanation regarding her salary is pretextual"); <u>Yandrisevitz v. H.T. Lyons, Inc.</u>, No. 08-1444, 2009 WL 2195139, at *7 (E.D. Pa. July 22, 2009) (plaintiff must "come forward with affirmative evidence, in the form of record facts, to support her claim.").

(Doc. No. 151 at 18.)  The Court agrees.  In viewing the evidence in the light most favorable to Plaintiff, she has not made any showing as to why the difference in pay between Baxter and Plaintiff is pretextual.  Thus, Plaintiff's disparate pay claim must be dismissed because there is no

genuine dispute of material fact.  Accordingly, summary judgment will be granted in favor of Defendant on this claim.

### C. Claims Under the ADA

Both parties argue that summary judgment should be granted in their favor on the disability discrimination and retaliation claims brought under the ADA (Counts V and VI).[15]  Accordingly, as required at the summary judgment phase, both claims are analyzed under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[16]  Under this analysis, a plaintiff "must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination."  Id. at 802.  Accordingly, the Court will analyze Plaintiff's disability discrimination and retaliation claims brought under the ADA under this framework.

1.   A Genuine Dispute of Material Fact Exists on Plaintiff's Disability Discrimination
Claim Under the ADA

Defendant argues that summary judgment should be granted in its favor on Count V because Plaintiff cannot establish a prima facie case for ADA discrimination.  The Court disagrees and finds that there are genuine disputes of material fact precluding a grant of summary judgment at this stage.

---

[15]  The ADA prohibits employers from discriminating:

> [A]gainst a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment.

42 U.S.C. § 12112(a).

[16]  There is no direct evidence of disability discrimination in this case.  Therefore, the burden-shifting analysis set forth in McDonnell Douglas applies.  Sampson v. Methacton School Dist., 88 F.Supp.3d 422, 434 (E.D. Pa. 2015).

To make a prima facie case under the ADA, a plaintiff must show that she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation, and (3) suffered an adverse employment decision because of the discrimination.  <u>Tice v. Centre Area Transp. Auth.</u>, 247 F.3d 506, 512 (3d Cir. 2001).  Here, the parties dispute the third prong.

Elements (1) and (2) are not in dispute.  Element (3) is contested.  Plaintiff argues that she suffered two adverse employment decisions because of disability discrimination.  First, that Defendant failed to engage in the interactive process required by the ADA prior to terminating her employment, and second, that she was terminated because of unlawful discrimination.[17]  The Court will discuss both claims in turn.

---

[17]  The Third Circuit has held that "[t]he ADA itself does not refer to the interactive process" but derives it from 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. § 1630.2(o)(3).  <u>Shapiro v. Township of Lakewood</u>, 292 F.3d 356, 359 (3d Cir. 2002).  42 U.S.C. § 12112(b)(5)(A) requires an employer to:

> [M]ak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer.]

29 C.F.R. § 1630.2(o)(3), a regulation passed pursuant to the ADA states:

> To determine the appropriate reasonable accommodation it may be necessary for [the employer] to initiate an informal, interactive process with [the employee] in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

In reading these statutes, the Circuit concluded that "[a]dverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities" which through 29 C.F.R. § 1630.2(o)(3) may be invoked by a failure to engage in the interactive process. <u>Id.</u> (quoting <u>Mengine v. Runyon</u>, 114 F.3d 415, 416 (3d Cir. 1997); <u>see also</u> <u>Parcel Serv.</u>, 214 F.3d 402, 407 (3d Cir. 2000); <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999).

i.  A Genuine Dispute of Material Fact Exists as to Whether Defendant Reasonably
Accommodated Plaintiff

As discussed above, the parties dispute whether Plaintiff established the third prong of a

prima facie case—whether Plaintiff suffered an adverse employment action.  The first adverse

employment action Plaintiff alleges is that Defendant failed to engage in an interactive process to

find her additional accommodations, as mandated by the ADA.  To demonstrate that a defendant

failed to engage in good faith in the interactive process, a plaintiff must show:

> 1) the employer knew about the employee's disability; 2) the employee requested
> accommodations or assistance for his or her disability; 3) the employer did not
> make a good faith effort to assist the employee in seeking accommodations; and 4)
> the employee could have been reasonably accommodated but for the employer's
> lack of good faith.

Hohider v. United Parcel Service, Inc., 574 F.3d 169, 187 (3d Cir. 2009).  Here, the parties dispute

the second and third prong—whether Plaintiff requested an accommodation prior to the expiration

of her short-term disability leave and whether Defendant made a good faith effort to assist Plaintiff

in seeking additional accommodations.  Plaintiff argues that while Defendant made a good-faith

effort to assist Plaintiff with leave accommodations in the past, Defendant did not reengage in the

interactive process when Plaintiff informed them that she needed additional accommodations.

(Doc. No. 98-2 at 15.)  Defendant disagrees, countering that Plaintiff never informed Defendant

that she required additional accommodations following the expiration of her short-term disability

leave on July 14, 2020, and that without notice, it had no requirements to reengage in the interactive

process.  (Doc. No. 99-1 at 41.)  These competing factual matters raise a genuine dispute of a

material fact.

Turning to the facts, Plaintiff argues that "it is undisputed that [Plaintiff] informed Ms.

Gross on or about July 1, 2020, that she had a doctor's appointment on July 14, 2020" and that

Plaintiff "told Ms. Gross that she intended to extend her leave of absence for a third time."  (Doc. No. 150 at 4.)  Defendant disagrees, stating that Plaintiff failed to communicate with Defendant regarding her work status or make any additional request for accommodation.  These facts raise a genuine dispute of material fact as to whether Plaintiff informed Defendant of her need for additional accommodations.  In finding that a genuine dispute of material fact exists, summary judgment is precluded on Plaintiff's ADA claim based on a failure to engage in an interactive process.

    ii.    A Genuine Dispute of Material Fact Exists as to Whether Defendant's Proffered Reason for Firing Plaintiff was Pretextual

As discussed above, only the third prong of the prima facie case of disability discrimination is in dispute—whether a plaintiff suffered an otherwise adverse employment decision as a result of disability discrimination.  To satisfy this prong, Plaintiff advances two theories of adverse employment decision—failure to engage in an interactive process and unlawful termination.  As noted above, there is a genuine dispute of material fact on the interactive process claim.  Thus, the Court must next evaluate Plaintiff's second argument—that Plaintiff was terminated because of her disability.

To meet this third prong, a plaintiff must show that their disability was a "determinative factor" in their employer's decision to terminate them.  Campo v. Mid-Atlantic Packaging Specialties, LLC, 564 F.Supp.3d 362, 380-81 (E.D. Pa. 2021); see also Emmell v. Phoenixville Hospital Company, LLC, 303 F.Supp. 3d 314, 332 (E.D. Pa.) ("Causation is required for both discrimination and retaliation claims under the ADA.") (citation omitted).  As this court discussed in Emmell:

> The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific."  Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir. 1997).  Close "temporal proximity," between the

> protected status or action by the employee and the adverse action by the employer,
> is suggestive but not determinative of causation.  Farrell v. Planters Lifesavers Co.,
> 206 F.3d 271, 280 (3d Cir. 2000). A causation determination is "not limited to
> timing and demonstrative proof, such as actual antagonistic conduct or animus,"
> but can depend on inferences based on the record as a whole.  Id. at 281.

Emmell, 303 F. Supp. at 332.

Here, in viewing the evidence in the light most favorable to Plaintiff at the summary judgement stage, her termination claim satisfies her prima facie case because she alleges sufficient causation.  Up until her termination on July 15, 2020, Plaintiff was on FMLA and short-term disability leave to treat her insomnia and anxiety.  Plaintiff's termination letter cited that she was being terminated because "you are no longer on an approved leave of absence and we have not heard from you since July 9, 2020, your employment will terminate on July 15, 2020."  (Doc. No. 99-68 at 3.)  Because this termination letter was sent on the evening of July 14, 2020, the day that Defendant alleges her leave of absence ended, Plaintiff has shown a "temporal proximity" between her leave to treat her disabilities and her termination.  Further, Plaintiff alleges other instances that could give rise to an inference of discrimination.  For example, Plaintiff testified in her deposition that when she spoke with Gross about her July 14, 2020 doctor's appointment in which her doctor would determine when she would be fit to return to work.  Plaintiff testified that Gross:

> become a little argumentative with me because I was trying to explain to her that I
> know that there was a difference and I don't know the dates and I didn't know when
> I was coming back, and I didn't have any information at the time. . . I told her that
> I would follow-up with her to let her know what would transpire from my doctor's
> appointment with Dr. Brookman on the 14th of July.

(Doc. No. 99-9 at 304:24-305:12.)  As discussed previously, the parties dispute whether this conversation took place.  However, in viewing the evidence in the light most favorable to Plaintiff at this stage, her alleged conversation with Gross could permit a reasonable jury to conclude that Plaintiff's termination gave rise to an inference of discrimination.  Accordingly, Plaintiff has

satisfied the prima facie case of wrongful termination in violation of the ADA because she has alleged "temporal proximity" between her disability leave and her termination and her alleged conversation with Gross could permit a reasonable jury to conclude that Plaintiff's termination was caused by her disability.

Thus, the Court moves to the second step of the <u>McDonnell Douglas</u> framework—whether Defendant can "articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>McDonnell Douglas</u>, 411 U.S. at 402.

Here, Defendant submits the same reason for her failure to return to work that is discussed in Section IV(B)(1)(ii), <u>supra</u>.  Accordingly, this reason satisfies Defendant's burden of offering a non-discriminatory reason for her termination, and the Court will turn to the final step of the <u>McDonnell Douglas</u> analysis.

In the third and final step of the analysis, a plaintiff must produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." <u>Harding v. CareerBuilder, LLC</u>, 168 Fed. App'x. 535, 538 (3d Cir. 2006) (quoting <u>Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1067 (3d Cir. 1996)).  The Third Circuit has articulated three possible ways to make this showing.  <u>See</u> <u>Harding</u>, 168 Fed. App'x. at 538.  A plaintiff can submit evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge."  <u>Id.</u>

Here, there is a genuine dispute of a material fact as to whether Plaintiff established pretext under her ADA discrimination claim.  As discussed above, Defendant alleges that it terminated Plaintiff because "Presidio had no obligation to keep Plaintiff's position open past the expiration of her short-term disability leave where, as here, Plaintiff failed to communicate with Presidio in

violation of its policy." (Doc. No. 99-1 at 44.) However, this creates a genuine dispute of a material fact because Plaintiff repeatedly asserts that she communicated with Gross about her need to extend her leave. Accordingly, summary judgment cannot be granted in favor of either party on this claim.

2.   A Genuine Dispute of Material Fact Exists on Plaintiff's ADA Retaliation Claim

Finally, in Count VI, Plaintiff alleges a retaliation claim against Defendant in violation of the ADA. (Doc. No. 1 at 19.) This claim also analyzed under the McDonnell Douglas framework, which begins with a plaintiff presenting a prima facie case of retaliation. See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (holding that McDonnell Douglas applies to ADA retaliation claims).

To establish a prima facie case of retaliation under the ADA, a plaintiff must show that "(1) he engaged in a protected employee activity; (2) his employer took some adverse action either after or contemporaneous with that protected activity; and (3) a causal connection existed between the employee's protected activity and the employer's adverse action." Cellucci, 987 F.Supp.2d at 593 (citing Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005)). To satisfy the first prong, a request for a reasonable accommodation constitutes protected activity. Fogleman, 122 F. App'x. 581.

Here, the parties dispute the first and the third prongs of the prima facie retaliation case. Under the first prong, Plaintiff states that she engaged in conduct protected by the ADA when she "request[ed] an accommodation for her disability." (Doc. No. 1 at 19.) As discussed in Section IV(C)(1)(i) supra, there is a genuine dispute of material fact over whether Plaintiff made this request. Thus, because there is a genuine dispute of material fact over whether Plaintiff engaged in a protected employee activity, the Court need not discuss the dispute over the third prong.

Accordingly, summary judgment will be denied with respect to Plaintiff's retaliation claim under the ADA.

**V. CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. No. 98) will be denied in its entirety, and Defendant's Motion for Summary Judgment (Doc. No. 99) will be granted in part and denied in part. Summary judgment will be granted in Defendant's favor on the PHRA Claims (Counts II and IV), the hostile work environment claims, the disparate pay claims and the gender-based retaliation claim (Count III). As such, the following claims remain in this case:

- Gender discrimination, in violation of Title VII (Count I)

- Disability discrimination, in violation of the ADA (Count V)

- Retaliation, in violation of the ADA (Count VI)

An appropriate Order follows.