IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAMI SMITH,<br><br>                  Plaintiff,<br><br>     v.<br><br>PRESIDIO NETWORKED SOLUTIONS,<br>INC.,<br><br>             Defendant. | CIVIL ACTION<br>NO. 22-736 |

## **TABLE OF CONTENTS**

**Slomsky, J.**                                                   **September 5, 2024**

**I.  INTRODUCTION** ................................................................................................................ **3**

**II.  FACTS** ............................................................................................................................... **4**

**III. LEGAL STANDARDS** .................................................................................................... **7**

  **A.  Back Pay** ...................................................................................................................... **7**

  **B.  Front Pay** ................................................................................................................... **10**

  **C.  Tax Gross Up Damages** ........................................................................................... **11**

**IV. ANALYSIS** .................................................................................................................... **11**

  **A.  Back Pay** .................................................................................................................... **11**

    1.  Plaintiff is Ineligible for Back Pay from July 15, 2020 to November 16, 2020 ........... 13

    2.  Plaintiff is Ineligible for Back Pay from November 16, 2020 to April 2023 ................ 17

3.   Plaintiff is Ineligible for Back Pay from April 2023 to July 17, 2024, the Date        of the Judgment ................................................................................................... 21

   **B.   Front Pay** ............................................................................................................... 23

**V.   CONCLUSION** ................................................................................................................ **27**

## I.     INTRODUCTION

On February 28, 2022, Plaintiff Kami Smith commenced this action against Defendant Presidio Networked Solutions, LLC ("Presidio" or "Defendant").  (Doc. No. 1.)  After ruling on cross-Motions for Summary Judgment, three claims remained: (1) gender discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I); (2) disability discrimination, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. (Count V); and (3) retaliation, in violation of the ADA (Count VI).  (Doc. Nos. 165, 166.)

Trial commenced on July 8, 2024 and concluded on July 16, 2024.  At the conclusion of trial, the jury found in favor of Plaintiff on only one Count—retaliation for Plaintiff's request for a reasonable accommodation, in violation of the ADA (Count VI).  (Doc. No. 202 at 6.)  On this Count, the jury declined to award Plaintiff compensatory and punitive damages, and only awarded her $1.00 in nominal damages.  (Id. at 7.)  On July 17, 2024, the Court entered Judgment in favor of Plaintiff in accordance with the jury's verdict, which awarded her a total of $1.00.  (Doc. No. 203.)

On the same day, Plaintiff filed the present Motion to Alter Judgment to Include Court-Determined Economic Loss ("Motion to Alter") and Attorneys' Fees.[1]  (Doc. No. 204.)  In the Motion to Alter, Plaintiff requests the Court to alter its Judgment to include economic loss for back pay, front pay, and tax gross-up damages.  (Id. at 1.)  In support of these requests, Plaintiff avers that she "testified extensively at trial about the nature and extent of her economic loss and mitigation efforts."  (Id. at 1-2.)   On July 29, 2024, Defendant filed a Response in Opposition, submitting that Plaintiff was not entitled to economic loss damages.  (Doc. No. 214.)  On August

---

[1] Plaintiff's counsel's request for an award of attorneys' fees will be subject of another Opinion and Order.

27, 2024, the Court held an evidentiary hearing on economic loss damages at which the Court requested additional letter briefing from the parties.  (Doc. No. 219.)  In accordance with this request, Plaintiff filed a supplemental letter in support of her request for economic loss damages on August 27, 2024.[2]  (Doc. Nos. 220, 221.)  On the same day, Defendant filed a letter response in opposition.  (Doc. No. 222.)  Accordingly, the Motion to Alter is now ripe for disposition.

## II.    FACTS

As will be discussed below, the relevant period for Plaintiff's economic damages is the period between Plaintiff's termination from Presidio—July 15, 2020—to the date of the Judgment—July 17, 2024.   At trial, Plaintiff testified about her alleged economic loss and mitigation efforts during that period.

On July 15, 2020, the start of the relevant period, Plaintiff was terminated from her job at Presidio.  (Doc. No. 207 at 201:7-10.)  Prior to her termination, Plaintiff was in sales, selling Defendant's Information Technology ("IT") services to other businesses.  (Id. at 59:11-12, 60:15-16.)  Her title was "Account Manager."  (Id.)  "Account Managers" at Presidio were compensated based on a "Commission Plan" that outlines an "Account Managers'" anticipated earnings for the year.  (See Doc. No. 214-9 at 2.)  For the 2020 sales year, which was from July 1, 2019 to June 30, 2020, Plaintiff's commission plan estimated "on-target-earnings" of $302,500.  (Id.)  This number was comprised of a base salary of $115,000 and a "variable commission paid monthly" totaling $187,500.  (Id.)  Plaintiff testified that an "Account Managers'" variable commission was

---

[2]    While Plaintiff's original Motion to Alter Judgment (Doc. No. 204) did not request a specific amount for back pay, front pay and tax-gross-up damages, her supplemental letter (Doc. No. 220) requested back pay of $139,236.51 in lost wages and front pay of reinstatement.  (Doc. No. 220 at 1-3.)

based on their performance and could be a higher or lower number than the estimate in the Commission Plan. (See Doc. No. 222-1 at 15:12-25.)

Before and after her termination from Presidio, Plaintiff was temporarily disabled due to her medical issues of insomnia and anxiety. (Id. at 209:22-210:21.) Based on her disability, Plaintiff collected disability benefits totaling $36,403.23 from her insurance company, Northwestern Mutual, for the period of July 15, 2020 through November 16, 2020. (Doc. Nos. 214-7 at 2, 207 at 214:14-20.)

On October 30, 2020, Plaintiff received an offer for a new sales job at Juniper Networks as a "Sr. Commercial Account Manager." (Doc. No. 214-8 at 2.) The offer letter outlined that Plaintiff would be paid in three ways: (1) base compensation of $146,000; (2) "on-target-earnings" of $146,000; and (3) a three-month "draw" of $6,083.33 per month. (Id.) The letter defined "on-target-earnings" as an incentive amount that Plaintiff was expected to earn contingent on her performance. (See id.) Further, the "draw" was an additional incentive that Plaintiff would receive for the first three months of her employment.[3] (Id.) Based on these three methods, her compensation at Juniper was anticipated to be $310,249.99. (See id.)

On November 16, 2020, Plaintiff began working at Juniper Networks. (Doc. No. 207 at 216:6-7.) Plaintiff testified that she performed well during her first year at Juniper, but during her second year, her performance declined:

> I did really well in my first year. You know, I did 150 percent of quota, which was overperform. And going into my second year . . . my quota increased, and I didn't make my quota.

---

[3] Plaintiff testified that a "draw" was similar to a bonus. (Doc. No. 207 at 216:19-217:2.)

(Id. at 220:14-19.)  On April 3, 2023, Plaintiff's manager met with her and presented her with a

"Performance Improvement Plan" ("PIP").   (Id. at 221:1-10; Doc. No. 214-10 at 2.)   The PIP

stated:

> As a follow-up to discussions we have had regarding your performance and the
> improvement areas you need to address, I am placing you on a Performance
> Improvement Plan (PIP) effective April 3rd for a period of up to 30 days.  During
> this time, your performance will be monitored carefully.  The purpose of this plan
> is to bring your performance up to the required level, as well as to ensure that you
> understand the implications should your performance not improve.

(Doc. No. 214-10 at 2.)  Under the heading "Summary of Performance Issues," Plaintiff's manager

noted that Plaintiff:

> [has] not made your annual quota and have missed your quarterly quota for the last
> 5 quarters . . .
>
> A significant amount of your decline stems from the fact that you are not engaged
> with your customers.  As discussed when we met in person before our [] meeting
> on January 19th, you admitted that you did not know the majority of your customers
> and that you need to have more engagement with those customers.

(Id.)   Finally, the PIP concluded with nine (9) "tasks/skills" that her manager wanted her to

improve on by certain dates.  (See id.)  Some of the nine (9) tasks/skills included "7 customer

meetings/calls per week. . . 3 partner meetings per week. . . [and] [c]reat[ing] a complete and

thorough business plan on the top 5 accounts in the account module." (Id. at 3-4.)  At trial, Plaintiff

described the meeting where her manager gave her the PIP:

> So I didn't make my quota.  I met with my new manager.  We discussed the fact
> that I didn't make my quota.  They weren't happy and negated the fact that I had
> done really well in my first year.  We talked about my status of employment, and
> he gave me a PIP, which is a performance review, essentially, a performance
> improvement plan.  And I knew I wasn't doing well in the job, and they made me
> an offer.   And they said you can either do the PIP and we reevaluate your
> performance, or you can leave the position, so I voluntarily left.

(Doc. No. 207 at 221:1-10.)  Thus, Plaintiff left her job at Juniper in April 2023.  (See id.)  After

leaving Juniper, Plaintiff began working a sales job as a "senior account manager" at ePlus.   (See

6

Doc. No. 211 at 105:22-25.)  She left that job in April 2024.  (See Doc. No. 207 at 233:7-11.) From April 2024 to July 17, 2024, the date of the Judgment, Plaintiff was unemployed.

## III.   LEGAL STANDARDS

As a preliminary matter, pursuant to 42 U.S.C. §§ 12117 and 2000e-5(g)(1), a plaintiff who prevailed on an ADA retaliation claim may be entitled to the equitable relief of back pay, front pay or tax gross-up damages.  See e.g., Marinelli v. City of Erie, 25 F.Supp.2d 674, 678 (W.D. Pa. 1998) ("[t]he ADA provides for all remedies available under Title VII, which includes back pay[,] front pay" and tax up damages).  Each form of relief will be discussed below.

### A.  Back Pay

As discussed above, Title VII back pay remedies may be available to a plaintiff who prevails on an ADA retaliation claim.  Marinelli, 25 F.Supp.2d at 678.  Under Title VII:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e-5(g)(1).

Back pay "is not an automatic or mandatory remedy, but one which the courts may invoke at their equitable discretion."  Donlin v. Phillips Lighting North America Corp., 581 F.3d 73, 84 (3d Cir. 2009) (internal quotation marks omitted) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 415 (1975)).  "The relevant time period for calculating an award of back pay begins with wrongful termination and ends at the time of trial."  Dejesus v. Kids Acad., Inc., No. 18-13822,

2020 WL 1921934, at *10 (D.N.J. Apr. 21, 2020) (internal quotation marks omitted) (quoting Blum v. Witco Chem. Corp., 829 F.2d 367, 373-74 (3d Cir. 1987)), rev'd on other grounds, No. 18-13822, 2020 WL 7383187, at *1 (D.N.J. Dec. 16, 2020). The purpose of awarding back pay is "to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination." Donlin, 581 F.3d at 84 (citing Loeffler v. Frank, 486 U.S. 549, 558 (1988)). However, if the plaintiff is subsequently able to secure a position "that is equivalent or better than the position she was wrongly denied, the right to damages ends because it is no longer necessary to achieve an equitable purpose . . ." Id. (citing Ford Motor Co. v. EEOC, 458 U.S. 219, 236 (1982)).

There is a "presumption in favor of a back pay award," and "given a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of [Title VII]." Booker v. Taylor Milk Co., 64 F.3d 860, 864, 866-67 (3d Cir. 1995) (internal quotations omitted) (quoting Albemarle, 422 U.S. at 421) (alteration in original). But a plaintiff who succeeds at trial under a Title VII claim still has "a statutory duty to mitigate damages." Id. at 864 (citation omitted). This statutory duty, found in Title VII, provides: "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1).

The employer, by contrast, "has the burden of proving a failure to mitigate." Booker, 64 F.3d at 864 (citations omitted); Donlin, 581 F.3d at 89 (citation omitted). This burden requires an employer to establish that: (1) "substantially equivalent work was available" and (2) "the Title VII claimant did not exercise reasonable diligence to obtain employment." Id. (citation omitted).

Substantially equivalent work is defined as "employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated." Booker, 64 F.3d at 866 (internal quotation marks and citations omitted). "The duty of a successful Title VII claimant to mitigate damages is not met by using reasonable diligence to obtain any employment . . . [but instead] to obtain substantially equivalent employment." Id. (citations omitted). Reasonable diligence "should be evaluated in the light of the individual characteristics of the claimant and the job market," which often includes reviewing "the economic climate and the employee's skills, qualifications, and age." A plaintiff typically exhibits reasonable diligence "by demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment." Id. at 865 (citations omitted); Tubari Ltd. v. NLRB, 959 F.2d 451, 454 (3d Cir. 1992) (citation omitted). It is expected that a plaintiff will "exercise good faith in attempting to secure a position." Booker, 64 F.3d at 865 (citation omitted).

If these elements are proven, "the amounts that could have been earned with reasonable diligence" are applied to either "reduce or decrease a back pay award, not to wholly cut off the right to any back pay." Id. at 866 (citations omitted) (emphasis in original).

However, an employer may satisfy its burden of establishing a failure to mitigate without proving that there was substantially equivalent work available. Caufield v. Ctr. Area School Dist., 133 F. App'x 4, 11 (3d Cir. 2005) (citing Tubari, 959 F.2d at 454). An employer may do so by demonstrating that the terminated employee "withdrew entirely from the employment market." Id. "A withdrawal from the employment market or '[a] willful loss of earnings' has been found where the plaintiff 'has failed to stay in the labor market, refused to accept comparable employment, failed to search diligently for other work, or voluntarily quit alternative employment

without cause.'"  Lienhard v. CHC Sols., Inc., No. 21-3230, 2023 WL 4237076, at *4 (quoting

Holocheck v. Luzerne Cnty. Head Start, Inc., No. 04-2082, 2007 WL 954308, at *15 (M.D. Pa.

Mar. 28, 2007)).  This alternative burden requires proof that the terminated employee withdrew

"completely," a burden that "is more onerous than establishing a plaintiff's job search was not

reasonably diligent."  Id. at *5 (quoting Caulfield, 133 F. App'x at 11; Ngai v. Urban Outfitters,

Inc., No. 19-1480, 2021 WL 1175155, at *20 (E.D. Pa. Mar. 29, 2021)).

### B.  Front Pay

As referenced above, Title VII, as applied to the ADA, provides for a successful plaintiff

to receive back pay and reinstatement.  See 42 U.S.C. § 2000e-5(g).  However, if reinstatement is

unavailable, which typically occurs when there is "no position available at the time of judgment

or the relationship between the parties . . . [has] been so damaged by animosity," front pay may be

awarded as a substitute remedial measure.  Ellis v. Ethicon, Inc., No. 05-726, 2009 WL 10641983,

at *21 (D.N.J. Nov. 13, 2009) (citing Maxfield v. Sinclair Int'l., 766 F.2d 788, 796 (3d Cir. 1985)).

"Since reinstatement is an equitable remedy, it is within the district court's discretion whether

reinstatement is feasible."  Id. (citations omitted).

"It is also widely recognized that reinstatement is not feasible in situations where an

employee has been terminated and subsequently filed suit against their employer."  Phillips v.

Starbucks Corp., Civ. Act. No. 19-19432, 2023 WL 5274541, at *7 (D.N.J. Aug. 16, 2023)

(citations omitted).  Under these circumstances, front pay is awarded "where a victim of

employment discrimination will experience a loss of future earnings because she cannot be placed

in the position she was unlawfully denied."  Donlin, 581 F.3d at 86 (citing Maxfield, 766 F.2d at

795- 97).  A failure to mitigate also precludes an award of front pay.  Lienhard, 2023 WL 4237076,

at *4 (citing Caufield, 133 F. App'x at 11).

### C.  Tax Gross Up Damages

Plaintiff also seeks tax gross up damages.  In <u>Eshelman v. Agere Sys., Inc.</u>, the Third Circuit noted that "employees may be subject to higher taxes if they receive a lump sum back pay award in a given year." 554 F.3d 426, 441 (3d Cir. 2009).  Tax gross up damages, therefore, are intended to "compensate[] [a plaintiff] for the negative tax consequences of receiving a lump sum award in employment discrimination actions."  <u>Andujar v. General Nutrition Corp.</u>, Civ. No. 14-7696, 2018 WL 3999569, at *9 (D.N.J Aug. 20, 2018).  In <u>Marcus v. PQ Corp.</u>, an Age Discrimination in Employment ("ADEA") case, the court stated:

> [A]n award to compensate a prevailing employee for her increased tax burden as a result of a lump sum award will, in the appropriate case, help to make a victim whole. This type of an award, as with prejudgment interest, represents a recognition that the harm to a prevailing employee's pecuniary interest may be broader in scope than just a loss of back pay. Accordingly, either or both types of equitable relief may be necessary to achieve complete restoration of the prevailing employee's economic status quo and to assure "the most complete relief possible."

458 F. App'x 207, 214 (3d Cir. 2012) (quoting <u>Eshelman</u>, 554 F.3d at 442). The court also cautioned that "there is no presumption in favor of an adjustment [of a verdict] for negative tax consequences."  <u>Id.</u> (citing <u>Eshelman</u>, 554 F.3d at 443).  Instead, "[e]mployees will continue to bear the burden to show the extent of the injury they have suffered" and courts are to "grant relief 'in light of the circumstances peculiar to the case.'" <u>Eshelman</u>, 554 F.3d at 443 (citations omitted).

### IV.    ANALYSIS

### A.  Back Pay

Defendant submits that Plaintiff cannot recover back pay because during the relevant time period she: (1) was first "unable to work" because she was totally disabled; then (2) "once she was no longer totally disabled, she fully mitigated her damages . . . by virtue of her voluntary resignations from better-paying jobs"; and (3) regardless, "any potential back pay award would be

entirely speculative." (Doc. No. 214 at 14.) Plaintiff disagrees, arguing that her subsequent jobs paid her less than she earned at Presidio and that she properly mitigated her damages. (Doc. No. 204 at 1-2.) In total, Plaintiff seeks $139,236.51 in back pay for lost wages.[4] (Doc. No. 220 at 2.)

As noted above, pursuant to 42 U.S.C. §§ 12117 and 2000e-5(g)(1), courts may determine that a plaintiff who prevailed on her claim of ADA retaliation is entitled to the equitable relief of back pay. See Tucker v. Shulkin, Civ. Act. No. 17-3598, 2020 WL 13682300, at *2 (E.D. Pa. Jan. 14, 2020). However, "[a] plaintiff must prove entitlement to back pay by a preponderance of the evidence . . . with reasonable certainty." Koch v. Mack Trucks, Inc., Civ. Act. No. 16-4857, 2018 WL 2461921, at *5 (E.D. Pa. June 1, 2018) (citing Pickens v. Se. Pa. Trans. Auth., Civ. Act. No. 15-1489, 2017 WL 3722427, at *3 (E.D. Pa. Aug. 29, 2017)).

Because "[b]ack pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination," Donlin, 581 F.3d at 84 "[a]n award of back pay is calculated from the date of the unlawful termination to the date that judgment is entered in the plaintiff's favor." Newton v. Pennsylvania State Police, Civ. Act. No. 18-1639, 2022 WL 874306, at *8 (citing Gallo v. John Powell Chevrolet, Inc., 779 F. Supp. 804, 813 (M.D. Pa. 1991)). Here, the relevant period is July 15, 2020, the day Plaintiff was

---

[4]   Plaintiff's seeks lost wages for the following years:

       2020:  $31,885.42
       2021:  $72,985.07
       2022:  ($6,142.49)
       2023:  $40,508.51
       2024:  $0.00

(Doc. No. 220 at 2.) Plaintiff represents that she is not seeking lost wages for 2022 and is subtracting $6,142.49 from her total request because she earned $6,142.49 more at Juniper in 2022 than she would have earned had she remained at Presidio. (Id.) Further, Plaintiff is not seeking back pay for 2024 because she was unemployed.

terminated from her employment, to July 17, 2024, the day this Court entered Judgment.  (See Doc. Nos. 1, 203.)  While the parties agree that this would be the applicable back pay period, Defendant submits that several exceptions bar Plaintiff from collecting any back pay.  These excepted time periods are:

- Plaintiff's termination from Presidio to the date she was no longer disabled.
    - July 15, 2020 to November 16, 2020.

- Plaintiff's employment at Juniper Networks.
    - November 16, 2020 to April 2023.

- Plaintiff's resignation from Juniper Networks to the Court's Judgment.
    - April 2023 to July 17, 2024.

The Court will discuss each of these time periods seriatim.

1. Plaintiff is Ineligible for Back Pay from July 15, 2020 to November 16, 2020

First, Defendant submits that Plaintiff is ineligible for back pay for the period of July 15, 2020 to November 16, 2020 because "Plaintiff was deemed totally disabled and unable to work." (Doc. No. 214 at 9.)  The Court agrees.

The Third Circuit has held that "as a general rule, an employment discrimination plaintiff will not be allowed back pay during any periods of disability."  McKenna v. City of Phila., 636 F. Supp. 2d 446, 465 (E.D. Pa. 2009) (quoting Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1101 (3d Cir. 1995)).  As the court explained in McKenna:

> The rationale behind this rule is that, because back pay is a compensatory remedy intended to restore the plaintiff to the position that he would have been in had he not been discriminated against, a plaintiff should not be able to receive back pay for a period when he was unable to work for reasons unrelated to the defendant's conduct. See Pierce v. Southeastern Pa. Trans. Auth., 2003 WL 21294905, at *3 (E.D. Pa. Feb. 12, 2003); Olabode v. Hecht Inc., 1997 WL 805187, at *10 (E.D. Pa. Dec. 30, 1997). The corollary to this rule is that it does not apply where the defendant's actions caused the disability. Savarese v. Agriss, 883 F.2d 1194, 1206 n. 19 (3d Cir. 1989).

Id.  Thus, a plaintiff is not entitled to back pay during a period of disability if they were: (1) "totally disabled" and (2) the defendant's actions did not cause the disability.  Id. (citing Savarese, 883 at 1206 n. 19).

Courts have found a plaintiff to be "totally disabled" based on the distribution of disability benefits and evidence that their disability prevented them from working.  See id.  For example, in McKenna, the court found plaintiff to be "totally disabled" because of the Social Security Administration's ("SSA") finding that he was "totally disabled," its distribution of benefits, and plaintiff's testimony.  Id.  Plaintiff testified "that his failure to look for work . . . was due to his debilitating depression."  Id.  Plaintiff, therefore, was not entitled to back pay. [5]  Id.

McKenna's holding is instructive in this case because there is similar evidence that Plaintiff was "totally disabled" and unable to work.  Here, Plaintiff was deemed "totally disabled" and received disability benefits from her insurance company from July 15, 2020 to November 16, 2020. In a letter dated December 18, 2020, Plaintiff's insurance company approved her for "total disability benefits" with a payment of $36,403.23.  (Doc. No. 214-7 at 2.)  Her insurance company further stated that this payment represented benefits from July 8, 2020 to "November 16, 2020, which is the day you were no longer disabled."  (Id.)  Finally, the letter noted that "[t]otal disability is one which prevents you from engaging in an occupation."  (Id. at 3.)

---

[5]   Further, the court in McKenna noted that the SSA's "finding of complete disability is not binding on the court . . . [but] can still be considered by this Court as evidence of [plaintiff]'s disability." Id. (citing Shomide v. ILC Dover, Inc., 521 F. Supp.2d 324, 334–35 (D. Del. 2007) (relying on SSA's finding of complete disability to cut off back pay, in the absence of any evidence from the plaintiff that he was able to return to work).  Thus, the court in McKenna recognized this limitation but found that the SSA's finding, coupled with the plaintiff's testimony, proved that plaintiff was disabled and ineligible for back pay.  See id.

Moreover, witnesses at trial also testified that Plaintiff's disabilities of depression and anxiety prevented her from working.  For example, Plaintiff testified at trial:

> [Counsel for Defendant]: So again, you were out on long-term disability between July and November of 2020, right?
>
> [Plaintiff]: Yes.
>
> [Counsel for Defendant]: And as we said, you told Northwestern Mutual that you needed long-term disability benefits because you couldn't work, right?
>
> [Plaintiff]: Correct.

(Doc. No. 207 at 214:14-20.)   Plaintiff also testified that her doctor, Dr. Robert Brookman, recommended during a July 2020 appointment with Plaintiff that she not return to work because she was still disabled.   (See id. at 16:22-17:2.)   Further, Dr. Brookman testified at trial that Plaintiff's disabilities of anxiety and insomnia were severe:

> Well, as I said, she couldn't really string two sentences together that really made a lot of sense, and she was all over the place as far as trying to describe things to me.
>
> . . .
>
> She wasn't sleeping. Maybe she was getting three hours a night, if that.  And if you're not sleeping -- when we sleep, that's when the body recovers. It's when it heals itself. It's when we augment the immune system. It's essential to keep proper sleep so that we have appropriate circadian rhythm of hormone secretions throughout the day. If you're not sleeping, you're falling apart.

(Doc. No. 208 at 182:18-18, 183:11-17.)  Dr. Brookman further testified:

> Q: And how does that severe -- excuse me. How does severe anxiety typically affect a person's daily life or work performance?
>
> [Dr. Brookman]: Well, they get to the point where they can't function.
>
> Q: And do you have an opinion as to whether Kami was at that point when you met with her?
>
> [Dr. Brookman]: When I met with her in March, yes. And that's why I felt it was essential for her to back off, stop working, take time for herself, for her husband, and for her children.

(Id. at 185:13-21.)

Accordingly, like the plaintiff in <u>McKenna</u>, Plaintiff was totally disabled from July 15, 2020 to November 16, 2020.  Thus, she is ineligible for back pay during that period.  Moreover, while there is an exception that allows back pay when "the defendant's actions caused the disability," that exception does not apply here for reasons described <u>infra</u>.  <u>McKenna</u>, 636 F. Supp. 2d at 465 (citing <u>Savarese v. Agriss</u>, 883 F.2d 1194, 1206 n. 19 (3d Cir. 1989)).

In <u>McKenna</u>, the court declined to apply the exception because it found that plaintiff's disability was not caused by defendant's actions for two reasons.  <u>See id.</u>  First, there were long periods of time and intervening actions between the employer's discrimination and the worsening of plaintiff's disability.  <u>Id.</u> at 466.  Second, there was evidence of other problems in plaintiff's life that could have caused the disability.  <u>Id.</u> (citing <u>Johnson v. Spencer Press of Maine, Inc.</u>, 364 F.3d 368, 383–84 (1st Cir. 2004)) (finding that there were "numerous other independent and significant contributing factors to [the plaintiff]'s psychological disability.")  In weighing this evidence, the court in <u>McKenna</u> concluded that "whatever happened in 2005 to cause [plaintiff]'s depression to intensify and cause him to become completely disabled is not related to the defendant's actions six years earlier."  <u>Id.</u>

Here, like the plaintiff in <u>McKenna</u>, Plaintiff is unable to prove that Defendant caused her disability.  First, Plaintiff testified at trial that Defendant's actions were a "part of the mental health issues."  (Doc. No. 214-5 at 19:19-23.)  This is not sufficient to show that Defendant caused Plaintiff's disability.  Further, like the plaintiff in <u>Johnson</u>, there is evidence of other factors that could have caused her mental health issues to worsen.  <u>See Johnson</u>, 364 F.3d at 384 (discussing the other issues plaintiff had in his life "including family deaths, divorce and problems with his sons.")  Here, while Plaintiff denied that these events caused her mental health to worsen, there

was extensive testimony regarding Plaintiff's marital and financial problems.[6]  For example, Dr.

Brookman testified:

> Q: And what factors did you consider when deciding whether or not to extend
> Kami's leave of absence?
>
> [Dr. Brookman]:   Well, I -- my feeling was, we had come so far, but I didn't feel
> that she was to the point of where she should be and I felt that if we sent her back
> too soon and added more stress to her life, that she would relapse. And I also know
> she was working on her marriage at that time and hoping to eliminate that kind of
> stress. And she now also was having time to spend with her family, her children.

(Doc. No. 208 at 191:24-192:7.)  Thus, considering these additional factors discussed at trial,

Plaintiff did not show that Defendant caused her disability.[7]  Accordingly, Plaintiff is ineligible

for back pay from the period of July 15, 2020 to November 16, 2020.

2.  <u>Plaintiff is Ineligible for Back Pay from November 16, 2020 to April 2023</u>

Next, Defendant submits that Plaintiff is ineligible for back pay while she was employed

at Juniper Networks because it was a substantially equivalent position that fully mitigated her

damages.  (Doc. No. 214 at 16.)  Plaintiff disagrees, arguing that she made less money at Juniper

Networks than she did at Presidio.  Specifically, Plaintiff seeks lost wages from her time at Juniper

of $139,236.51.[8]  (<u>See</u> Doc. No. 220 at 2.)

In the Third Circuit, the back pay period ends when a victim of discrimination accepts a

job that is "better or substantially equivalent."  <u>Vermeer v. Univ. of Del.</u>, Civ. Act. No. 21-1500,

---

[6]  For example, despite testifying that it caused her no stress, Plaintiff testified at trial that she was
having an extramarital affair with one of her coworkers at Presidio.  (<u>See</u> Doc. No. 207 at 180:18-
22.)

[7]  Further, there is also evidence in the record that Plaintiff had mental health issues prior to working
for Defendant.  (<u>See</u> Doc. No. 173.)  For example, Plaintiff's psychiatrist testified in her deposition
that Plaintiff was previously prescribed medication to treat depression and anxiety in her twenties.
(<u>See</u> <u>id.</u> at 13-14.)

[8]  <u>See</u> fn. 4 <u>supra</u>, for a full breakdown of this request by year.

2024 WL 81291, at *15 (D. Del. Jan. 8, 2024); see also Milton v. Bell Laboratories, Inc., 428 F.

Supp. 502 (D.N.J. 1977).  As the court explained in Vermeer:

> "Back pay is designed to make victims of unlawful discrimination whole by
> restoring them to the position they would have been in absent the discrimination."
> Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 84 (3d Cir. 2009).  Courts
> have equitable discretion to award back pay; it is neither "an automatic [n]or [a]
> mandatory remedy."  Id.  If a plaintiff secures new employment that is "better or
> substantially equivalent," Ford Motor Co. v. EEOC, 458 U.S. 219, 236, 102 S.Ct.
> 3057, 73 L.Ed.2d 721 (1982), "the right to damages ends because it is no longer
> necessary to achieve an equitable purpose," Donlin, 581 F.3d at 84. Employment
> is substantially equivalent when it involves "virtually identical promotional
> opportunities, compensation, job responsibilities, and status as the position from
> which the [ADA] claimant has been discriminatorily terminated." Booker v. Taylor
> Milk Co., 64 F.3d 860, 866 (3d Cir. 1995).

Id. (footnote omitted); see also Goodwin v. City of Pittsburgh, 480 F. Supp. 627, 636 (W.D. Pa.

1979) (holding that employee was entitled to back pay from the date of his discharge to the date

he was hired by another company at a substantially similar rate of pay) (affirmed without opinion).

Here, Plaintiff's employment at Juniper networks was substantially equivalent to her

position at Presidio.  First, both positions had substantially similar titles.  At Presidio, Plaintiff's

title was "Account Manager" and at Juniper, Plaintiff's title was "Sr. Commercial Account

Manager."  (See Doc. Nos. 214-8, 214-9.)  Second, the base compensation was better at Juniper

than it was at Presidio.  At Presidio, Plaintiff's base salary for July 1, 2019 to June 30, 2020 was

$115,000.  (Doc. No. 214-9 at 2.)  At Juniper, Plaintiff's base compensation was $146,000.  (Doc.

No. 214-8 at 2.)  And while both positions involved commissions which can vary, Plaintiff's "on-

target-earnings" for 2020 were substantially similar at both employers.  At Presidio, Plaintiff's on-

target-earnings were predicted to be $302,500.  (Doc. No. 214-9 at 2.)  At Juniper, Plaintiff's on-

target-earnings were predicted to be $292,000.  (Doc. No. 214-8 at 2.)  Juniper's offer letter to

Plaintiff also included a "draw" or a "bonus" of $6,083.33 a month for each of Plaintiff's first three

months of employment.  (Id.)  Accordingly, by adding those three months of pay, Plaintiff's total

18

offer of compensation at Juniper was $310,249.99. Thus, the on-target-earnings at Juniper were

higher than Plaintiff's "on target earnings" at Presidio.[9] Further, Plaintiff testified at trial that her

job duties were similar at both Presidio and Juniper:

---

[9] Plaintiff contends that Juniper was not a higher-paying job because she had less earnings at Juniper than at Presidio in 2019. (See Doc. No. 220 at 2.) However, this comparison is improper because her 2019 earnings are not representative of her typical earnings at Presidio. Rather, Plaintiff's testimony shows that 2019 was an "outlier year," mainly attributable to her one-time commission from what has been referred to as the Hitachi/Allergan deal. (Id.)

Other courts in this district, when tasked with calculating back pay for a commission-based job, have found that the calculation "involves more than a straight-line projection of [plaintiff's] prior earnings." Gallo, 779 F. Supp. at 808 (calculating back pay based on average commission earnings); see also Rios v. Marv Loves 1, 2015 WL 5161314, at *14 (finding that it was "fair and appropriate to apply an average weekly wage rate of $500" based on plaintiff's variable earnings); Ditullio v. Pizzo, No. 89–5673, 1991 WL 129860, at *2 (E.D. Pa. July 11, 1991), aff'd, 953 F.2d 1379 (3d Cir. 1992) (applying an average of plaintiff's earnings to calculate back pay). This principle applies here because Plaintiff testified that her compensation, based in part on commissions, varied each year.

Further, Plaintiff concedes that she earned far more in 2019 than she earned in other years at Presidio. (See Doc. No. 222-1 at 18:20-25.) She also agreed that these earnings were caused mainly by her commission from the Hitachi/Allergan deal:

> Q: Okay so let's turn back to 2019. Your earnings in 2019 were quite a bit higher than what you earned in 2017 and 2018, correct?
>
> [Plaintiff]: Yes.
>
> Q: And 2019 was the year you closed a big deal with Hitachi Consulting. We talked about that extensively at trial, correct?
>
> [Plaintiff]: Yes.
>
> Q: And that was the biggest deal of your career, right?
>
> [Plaintiff]: Yes.
>
> Q: But as you testified that deal closed and it never went anywhere after that again, correct?

> Q: And your job duties [at Juniper] were basically the same as they were at Presidio, right?
>
> [Plaintiff]: Somewhat the same, yes.

(Doc. No. 207 at 216:5-7.)  Finally, Plaintiff also established that she had substantially similar, or better, promotion opportunities at Juniper, which is reflected in her testimony on her first-year performance at Juniper.  Plaintiff testified:

> I did really well [at Juniper] in my first year.  You know, I did 150 percent of quota, which was overperform.

(Doc. No. 207 at 220:14-19.)  Further, Plaintiff concedes that she earned more at Juniper in 2022 than she earned in 2019, which was Plaintiff's highest-earning year at Presidio.  Accordingly, Plaintiff's employment at Juniper Networks was substantially similar to her employment at Presidio because both positions had virtually identical titles, job responsibilities, and status.  Further, her compensation and promotional opportunities were better at Juniper than at Presidio.  Therefore, for all the above reasons, Plaintiff is ineligible for back pay while she was employed at Juniper Networks.

---

> [Plaintiff]:  Correct.

 (Id. at 216:11-23.)

Plaintiff's tax documents also show that her 2019 compensation was an outlier and not representative of her typical earnings at Presidio.  Specifically, her W2 tax forms show that Plaintiff earned $269,804.37 at Presidio in 2017 and $175,564.81 at Presidio in 2018.  (See Doc. No. 222-1 at 13:25-14:18.)  These figures are significantly lower than Plaintiff's 2019 earnings at Presidio of $333,032.51.  (See Doc. No. 221.)

In sum, the Court rejects Plaintiff's contention that it should use Plaintiff's 2019 earnings at Presidio for purposes of comparing her compensation at Presidio and Juniper.  Rather, in comparing both on-target-earnings and actual earnings, Plaintiff's position at Juniper was substantially similar to her position and earnings at Presidio.

3.  <u>Plaintiff is Ineligible for Back Pay from April 2023 to July 17, 2024, the Date of the Judgment</u>

Finally, Defendants allege that Plaintiff is not eligible for back pay for any period after Plaintiff began employment at Juniper Networks because she failed to mitigate her damages when she quit her job at Juniper.  Defendant alleges that Plaintiff quit when Juniper Networks placed her on a Performance Improvement Plan ("PIP").

The employer "has the burden of proving a failure to mitigate."  <u>Booker</u>, 64 F.3d at 864 (citations omitted); <u>Donlin</u>, 581 F.3d at 89 (citation omitted).  An employer can establish this burden "by demonstrating that the terminated employee 'withdrew entirely from the employment market.'" Phillips, 2023 WL 5274541, at *7 (quoting <u>Caufield v. Ctr. Area School Dist.</u>, 133 F. App'x 4, 11 (3d Cir. 2005)).  "A withdrawal from the employment market or '[a] willful loss of earnings' has been found where the plaintiff 'has failed to stay in the labor market, refused to accept comparable employment, failed to search diligently for other work, or voluntarily quit alternative employment without cause.'"  <u>Lienhard v. CHC Sols., Inc.</u>, No. 21-3230, 2023 WL 4237076, at *4 (quoting <u>Holocheck v. Luzerne Cnty. Head Start, Inc.</u>, No. 04-2082, 2007 WL 954308, at *15 (M.D. Pa. Mar. 28, 2007)).  This burden requires proof that the terminated employee withdrew "completely," a burden that "is more onerous than establishing a plaintiff's job search was not reasonably diligent." <u>Id.</u> at *5 (quoting <u>Caulfield</u>, 133 F. App'x at 11; <u>Ngai v. Urban Outfitters, Inc.</u>, No. 19-1480, 2021 WL 1175155, at *20 (E.D. Pa. Mar. 29, 2021)) (emphasis omitted).

While not directly addressed by courts in this district, courts in other districts have found that when "the discharged [ADA] plaintiff subsequently finds similar employment, but then voluntarily quits, back pay should be decreased by the amount he would have earned had he not

quit." Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1273 (4th Cir. 1985). "The back pay period is tolled, however, when the voluntary termination is without compelling or justifying reasons." Id. at 1278 (citing Knickerbocker Plastics Co., Inc., 132 NLRB 1209, 1212 (1961)); see also Narbors v. N.L.R.B., 323 F.2d 686, 693 (5th Cir. 1963) (finding "that from the time [claimant] quit a job for personal reasons no back pay should be allowed. [However,] ... the back pay should resume when he obtained another job."); Mclaughlin v. Mercury Freight Lines, Inc., Civ. No. 6656-71-P, 1972 WL 254, *4 (S.D. Ala. Aug. 17, 1972) (finding that plaintiff was not entitled to back pay when he voluntarily resign[ed] from a better-paying job). Because courts in this district have applied the Fourth Circuit's holding in Brady, supra, to situations involving involuntary termination, this Court too will follow Brady's holding on voluntary resignations. See Perez v. Lloyd Industries, Inc., Civ. Act. No. 16-cv-1079, 2019 WL 3765657, at *8 (E.D. Pa. Aug. 9, 2019) (holding that "[i]nvoluntary terminations from subsequent employment will toll back pay where the reasons for the termination are unrebutted and justified on the record.") [10]

Here, Plaintiff voluntarily quit her job at Juniper without a compelling or justifying reason. Rather, she quit because she did not want to work through a Performance Improvement Plan ("PIP"). At trial, she testified:

> So I didn't make my quota. I met with my new manager. We discussed the fact that I didn't make my quota. They weren't happy and negated the fact that I had done really well in my first year. We talked about my status of employment, and he gave me a PIP, which is a performance review, essentially, a performance improvement plan. And I knew I wasn't doing well in the job, and they made me an offer. And they said you can either do the PIP and we reevaluate your performance, or you can leave the position, so I voluntarily left.

---

[10] Further, because the court in Perez recognized that "a voluntary quit does not toll the [back pay] period when it is prompted by unreasonable working conditions or the earnest search for better paying employment," the opposite is also true. See Perez v. Lloyd Industries, Inc., 2019 WL 3765657, at *8 (E.D. Pa. Aug. 9, 2019) (quoting Brady, 753 F.2d at 1277.) Accordingly, a voluntary resignation will toll the back pay period without a compelling or justifying reason.

(Doc. No. 207 at 221:1-10.)   Thus, Defendant has established "[a] willful loss of earnings" and met its burden of proving a failure to mitigate because Plaintiff voluntarily quit her job without a compelling or justifying reason.

Finally, Defendant argues that Plaintiff's voluntary resignation makes her ineligible for any back pay up to the date of the Judgment.   "When an employer successfully proves a failure to mitigate, any back pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and any front pay award will be foreclosed."  Caufield, 133 F. App'x at 11 (citing Ford, 458 U.S. at 233-34).  As explained by the United States Supreme Court in Ford:

> An unemployed or underemployed claimant . . . is subject to the statutory duty to minimize damages . . . This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied.

Ford, 458 U.S. at 231-32.   Applying Ford to the facts at hand, because Plaintiff quit her substantially equivalent job at Juniper Networks, she forfeited her right to back pay.[11] Consequently, Plaintiff will not be awarded back pay.

**B.  Front Pay**

Defendant submits that Plaintiff is not eligible for front pay because she failed to mitigate her damages by voluntarily resigning from her employment at Juniper Networks.  (Doc. No. 214 at 16.)  The Court agrees.

---

[11]   Moreover, even if this Court were to consider Plaintiff's later employment at "ePlus" for purposes of back pay, Plaintiff testified at trial that she "voluntarily left" her position at ePlus.  (Doc. No. 208 at 24:11-22.)

As noted above, in the Third Circuit, "[w]hen an employer successfully proves a failure to mitigate . . . any front-pay award will be foreclosed." Caufield, 133 F. App'x at 10. Here, as discussed in Section IV(A)(2)-(3) supra, Defendant proved that Plaintiff failed to mitigate her damages because she voluntarily quit substantially equivalent work at Juniper Networks without cause. For this reason, and another one, Plaintiff will not be awarded front pay.

The second reason is that Plaintiff will not be afforded the equitable relief of reinstatement she requests. Reinstatement is not feasible based on the record in this case. In the Third Circuit, if a prevailing plaintiff requests reinstatement, "[t]he court must decide whether reinstatement is feasible." Blum, 829 F.2d at 374 n.4. In making this determination, "the district court has broad discretion" based on "the particular circumstances of a case." Feldman v. Phila. Housing Auth, 43 F.3d 823, 832 (3d Cir. 1994); see also Ellis, 2009 WL 10641983, at *21 ("reinstatement may not be feasible in all cases") (citing Goldstein v. Manhattan Indus. Inc., 758 F.2d 1435, 1438-49 (3d Cir. 1985)). For example, courts have denied reinstatement "when there exists 'irreparable animosity between the parties.'" Feldman, 43 F.3d at 832; see also Blum, 829 F.2d at 373-4. Irreparable animosity exists when there is a strong likelihood of "continuing disharmony" and the "difficulty of policing an ongoing relationship." Goss v. Exxon Office Systems Co., 747 F.2d 885, 890 (3d Cir. 1984) (citing Dillon v. Coles, 746 F.2d 998 (3d Cir. 1984). In Dillon, the Third Circuit affirmed the trial court's finding that:

> I do not believe that either plaintiff or defendant would seriously contend that it would be sensible to order plaintiff reinstated to a job in which harmonious working relationships are so important after the acrimony this case has engendered, nor could I possibly draft an injunctive order that would effectively make the existing ill feelings disappear.

Id.

24

The same principles apply here. First, it would not be sensible to reinstate Plaintiff to a job at Presidio after she expressed her ill feelings toward Presidio at trial. During the closing argument of counsel for Plaintiff, in addition to counsel labeling Presidio as a "toxic work culture" and "boys club," he argued to the jury:

> You have witnessed a calculated level of cruelty in this case. Kami was bullied at work. She was bullied throughout this litigation, and she's been bullied in this trial.

(Doc. No. 211 at 180:17-21.) The Court has difficulty understanding why Plaintiff would want to return to an employer that "bullied" her, or why Plaintiff believes that her allegations of "bullying" and a "toxic would culture" would not cause irreparable animosity between herself and Presidio. Notably, no evidence has been presented that her ill feelings towards Presidio have changed; she simply testified that some—but not all—of the individuals that supervised her at Presidio no longer work there. (See Doc. No. 223 at 37:16-38:2.) On this point, Defendant counters that reinstatement would "place Plaintiff into direct contact with many of the individuals that she unsuccessfully accused of discriminating against her, including, but not limited to, Christopher Cagnazzi, Vincent Trama, Claudia Bambino, and Anna Gross." (Doc. No. 222 at 7.) Put differently, Plaintiff's argument that she wants to return to work at Presidio because some employees she accused of mistreating her no longer work there lacks credence because some of these employees still remain.

Second, like the plaintiff in Dillon, Plaintiff's newfound desire for reinstatement is questionable. The jury did not fully accept Plaintiff's trial testimony about the extent of Defendant's alleged actions, and Plaintiff did not present her desire for reinstatement to the jury. Instead, she testified extensively about her poor treatment by Presidio employees. Now, in evaluating Plaintiff's post-trial request for reinstatement, not only is the Court challenged to understand why Plaintiff would want to return to an employer that allegedly "bullied" her, but

because the jury questioned in part Plaintiff's credibility, the same concerns apply to her newfound testimony that she wants to return to Presidio.

Finally, the circumstances here present the potential "difficulty of policing an ongoing relationship" if Plaintiff is reinstated.  Specifically, Plaintiff's testimony has established a pattern of performance issues and resigning from jobs in sales.  At Juniper Networks, Plaintiff was placed on a Performance Improvement Plan ("PIP") and instead of working to improve her performance, she quit her job.  She also quit her job at ePlus.  Notwithstanding the fact that reinstatement would essentially be rewarding a plaintiff who chose to be unemployed rather than work with her employer on performance issues, she presented no evidence that she would not continue this pattern of quitting if she returned to Presidio.[12]   In sum, Plaintiff's newfound interest in reinstatement is inconsistent at best.  For these reasons, Plaintiff's request for reinstatement will be denied.

---

[12] Further, evidence presented at trial shows that while Plaintiff was employed at Presidio, she was planning to leave her job.  First, while was still employed at Presidio, she told her psychiatrist that she "paid for [a] resume service" and that she will "have to leave the company, Presidio . . . I need another job."  (Doc. No. 207 at 184:11-12.)  Further, Plaintiff admitted that on July 7, 2020, eight days before Plaintiff was terminated, she was looking for a new job:

> Q: So you're telling [Plaintiff's former boss] you're looking for a new job on July 7th?
>
> [Plaintiff]: I was—yeah.  A lot of people look for new jobs while they're currently working.
>
> Q: And you're asking him what you should negotiate for with respect to your pay?
>
> [Plaintiff]: I don't think that's a bad question to ask Jerry based on my experience at the time.

(Id. at 185:9-16.)  In sum, this evidence, coupled with Plaintiff's pattern of resignations, shows that even if this Court ordered reinstatement, Plaintiff may repeat this pattern.

Finally, because the Court is not awarding Plaintiff back pay or front pay, she may not be awarded tax gross up damages.  As discussed above, "a district court may award a prevailing employee an additional sum of money to compensate for the increased tax burden a back pay award may create[.]" Perez, 2019 WL 3765657, at *6 (citations omitted).  But because this Court is not awarding Plaintiff front pay or back pay, she will not be awarded tax gross-up damages.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Alter Judgment to Include Court-Determined Economic Loss (Doc. No. 204.) will be denied.  An appropriate Order follows.